No. 61,170

J. W. THOMPSON COMPANY, *Appellee,* v. WELLES PRODUCTS CORPO-
RATION, *Defendant,* and PENTA CONSTRUCTION COMPANY, INC.,
and FEDERAL INSURANCE COMPANY, *Appellants.*

(758 P.2d 738)

Opinion
filed July 8, 1988.

*Wyatt A. Hoch,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, argued
the cause, and *Robert L. Howard,* of the same firm, was with him on the briefs for
appellants.

*William P. Tretbar,* of Fleeson, Gooing, Coulson & Kitch, of Wichita, argued
the cause and was on the brief for appellee.

*William A. Larson,* of Gehrt & Roberts, Chartered, of Topeka, was on the brief
*amicus curiae* for The Associated General Contractors of Kansas, Inc.

The opinion of the court was delivered by

McFARLAND, J.: In this action plaintiff, J. W. Thompson Com-
pany (Thompson), seeks to recover the selling price of certain

component parts it supplied which were utilized by defendant Penta Construction Company, Inc., (Penta) in the latter's completion of a construction contract of a public works project. Liability is predicated upon Penta's payment bond filed pursuant to K.S.A. 60-1111, and, alternatively, upon a theory of unjust enrichment. The district court held in favor of Thompson, and Penta and Federal Insurance Company (Federal) appeal therefrom.

The primary issue before us is the legal relationship existing between Penta and defendant Welles Products Corporation (Welles), although Welles is not a party to this appeal. Thompson supplied the component parts under an agreement with Welles. If Welles was a subcontractor of Penta, then Thompson is within the classification of a supplier to a subcontractor granted protection by K.S.A. 60-1111, the public works bond statute. If Welles was a supplier to Penta, then Thompson's claim as a supplier to a supplier is not within a classification afforded protection by the statute, and there is no liability on Penta's bond (defendant Federal being the surety thereon). The district court held that Welles was a subcontractor of Penta and entered judgment in favor of Thompson for $36,097 plus interest and costs.

The district court adopted, in toto, Thompson's proposed findings of fact and conclusions of law. The instrument so adopted is a mixture of factual findings, legal conclusions, and plaintiff's arguments in support of its position. Fortunately, the pertinent facts, although complex, are essentially uncontroverted and may be winnowed from the adopted instrument for summarization herein.

The City of Wichita (City) operates its Wastewater Treatment Plant No. 2. In the facility were three large storage containers known as "digesters." Sewage, after being subjected to a number of treatment processes, is deposited into a digester for further treatment before being discharged into the Arkansas River. The City of Wichita determined that a fourth digester was needed and the plant's motor control center needed to be relocated and upgraded. On December 29, 1983, the City entered into a contract with Penta to perform the necessary work at a cost of $1,126,000.

On January 31, 1984, Penta filed a statutory payment bond for the public works project with the Clerk of the Sedgwick County

District Court in the sum equal to the contract. Following the requirements of K.S.A. 60-1111(a), the bond stated:

67.3 "Now THEREFORE, if the said principal [Penta] or the subcontractor or subcontractors of said principal shall pay all indebtedness incurred for supplies, material or labor furnished, used or consumed in connection with or in or about the construction or making of the above described improvement . . . this obligation shall be void; otherwise, it shall remain in full force and effect."

The bond identified Federal as surety.

On February 6, 1984, Penta contracted with Welles for the purchase of materials and equipment as follows:

One (1) floating digester cover (100' in diameter);

Four (4) eductomix gas mixing systems;

Two (2) gas compressors with housing and overhead piping accessories.

The engineering firm in charge of the project for the City was Wilson & Company Engineers and Architects (Wilson). Welles agreed to provide the materials and equipment in accordance with section 11B of the project's specifications, which included the preparation and submission to Wilson for approval of shop drawings for the piece-by-piece layout of the floating cover and compressor systems. Penta was responsible for the installation of the entire system, which included the Welles components. Welles was to provide a representative to inspect Penta's installation for the "start-up" of the gas mixing system equipment and to train city personnel in the use of the gas mixing equipment. The purchase price specified in the Penta-Welles purchase order was $290,000 (later adjusted slightly downward).

Some further explanation of the portion of the system purchased from Welles is appropriate. The circular floating cover of the digester was to move up and down dependent on the level of sewage in the digester. The cover would hold in the methane gas produced by the decomposition of the materials. The gas mixing systems and compressors were to be contained essentially in a rectangular housing situated on top of the cover with the purpose of same being to force the methane gas back through the sewage to accelerate the treatment process. These types of equipment are not regularly stocked items and must be specially manufactured to meet the needs of the plant wherein they are to be utilized.

Thompson is a manufacturer's representative for industrial air

and material handling equipment. It also designs, builds, installs, and starts up complex industrial mechanical systems. In August 1984, Welles contracted with Thompson to supply certain of the components needed to fulfill its purchase order with Penta. These consisted essentially of gas compression systems housed on top of the cover but excluding the cover, the two gas compressors, and the control panel. The initial purchase price was $34,230, but subsequent changes agreed to between Welles and Thompson increased the price to $46,097. The gas compressor assembly was shipped to the job site by Thompson on April 23, 1985. Welles had previously paid Thompson $10,000, leaving a balance due of $36,097. Welles has never made any additional payments.

Penta installed the gas compressor assembly on the floating cover supplied by Welles and the two gas compressors. Pursuant to its agreement with Penta, a Welles representative inspected Penta's installation of the gas compression equipment and assisted Penta's employee in making some minor adjustments. No effort was made to start up the equipment. In July, a Welles representative returned to the job site for start-up as required by the Penta-Welles agreement. The gas compressor equipment did not function by virtue of some difficulties with certain safety switches. Some of the problems in the switches were due to design error—whether these were attributable to Welles or Wilson is unclear and such determination is unnecessary to the opinion herein. Ultimately, the safety switch problem was resolved and the gas compression equipment performed satisfactorily. No Thompson personnel were ever at the job site.

The construction contract was completed by Penta and accepted by the City of Wichita in December 1985. On January 15, 1986, Thompson brought this action seeking payment of the $36,097 owed plus interest and costs. Welles never appeared in the action, and a default judgment was entered in favor of Thompson on April 8, 1986, for the full amount of the claim. No appeal has been taken therefrom. In 1987, a bench trial was held as to Thompson's claims against Penta and its surety (Federal). On July 7, 1987, the trial court entered the following judgment:

"Judgment granted in the sum of $36,097.00 plus interest at the statutory rate from and after November 5, 1985, plus court costs. (The Court adopts as its own the Findings of Fact and Conclusions of Law as submitted by Mr. Tretbar [counsel of Thompson])."

Penta and its surety appeal from the judgment.

The first issue before us is whether the district court erred in concluding that Welles was a subcontractor to Penta rather than a supplier. This legal conclusion was crucial to the subsequent conclusion that Penta and its surety were liable on the bond herein.

The standard of appellate review is clear. Where the trial court has made findings of fact and conclusions of law, the function of this court on appeal is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. *Moore v. R. Z. Sims Chevrolet-Subaru, Inc.*, 241 Kan. 542, Syl. ¶ 3, 738 P.2d 852 (1987); *Rosenbaum v. Texas Energies, Inc.*, 241 Kan. 295, Syl. ¶ 5, 736 P.2d 888 (1987); *Southwest Nat'l Bank of Wichita v. ATG Constr. Mgt., Inc.*, 241 Kan. 257, Syl. ¶ 1, 736 P.2d 894 (1987).

Were the trial court's findings of fact sufficient to support its legal conclusion that Welles was a subcontractor of Penta rather than a supplier or materialman? We believe not.

As the *amicus* brief filed by the Associated General Contractors of Kansas, Inc., (AGC) ably points out, the terms of the purchase order between Penta and Welles are wholly consistent with it being a contract for the purchase of equipment and are significantly lacking in the basic requirements of a subcontract. The instrument speaks of the sale price, contract of sale, return of goods, security interest in goods delivered, delivery dates, etc. There is no reference to work to be performed, performance bonds, maintenance of general liability insurance, workers' compensation requirements, that proof be supplied of payment of labor and materials used, hold harmless agreements for negligence, etc. Penta and Welles are referred to as buyer and seller, respectively. There is no evidence that either Penta or Welles considered their relationship to be that of contractor-subcontractor rather than what the purchase order clearly showed to be a buyer-seller relationship.

K.S.A. 60-1111 provides, in pertinent part:

"(a) *Bond by contractor.* Except as provided in subsection (c), whenever any public official, under the laws of the state, enters into contract in any sum exceeding $10,000 with any person or persons for the purpose of making any public improvements, or constructing any public building or making repairs on

the same, such officer shall take, from the party contracted with, a bond to the state of Kansas with good and sufficient sureties in a sum not less than the sum total in the contract, conditioned that such contractor or the subcontractor of such contractor shall pay all indebtedness incurred for labor furnished, materials, equipment or supplies, used or consumed in connection with or in or about the construction of such public building or in making such public improvements.

"(b) *Approval, filing and limitations.* The bond required under subsection (a) shall be approved by and filed with the clerk of the district court of the county in which such public improvement is to be made. When such bond is filed, no lien shall attach under this article, and if when such bond is filed liens have already been filed, such liens shall be discharged. Any person to whom there is due any sum for labor or material furnished, as stated in the preceding section, or such person's assigns, may bring an action on such bond for the recovery of such indebtedness but no action shall be brought on such bond after six months from the completion of said public improvements or public buildings."

The contractor's public works bond provided for in K.S.A. 60-1111 precludes attachment of liens. As stated in *Cedar Vale Co-op Exch., Inc. v. Allen Utilities, Inc.,* 10 Kan. App. 2d 129, Syl. ¶ 1, 694 P.2d 903 (1985):

"In Kansas, contractors' bonds furnished on public works projects are substitutes for mechanics' liens. Contractors' bonds are for the use of all persons in whose favor liens might accrue."

See *Murphree v. Trinity Universal Ins. Co.,* 176 Kan. 290, 269 P.2d 1025 (1954).

*Indiana Limestone Co. v. Cuthbert,* 126 Kan. 262, 267 Pac. 983 (1928), delineated the bounds of coverage under the public works bond statute. There, Scott Brothers Construction Co. (general contractor) contracted to build a new school in Wichita. Scott Brothers purchased stone from Cuthbert, which, in turn, purchased stone from Indiana Limestone. Indiana Limestone fabricated the stone in accordance with plans and specifications furnished to it. Cuthbert took no part in the construction of the building but merely procured and delivered the stone to the worksite. 126 Kan. at 263. When Cuthbert went bankrupt and failed to pay for the stone, plaintiff filed a claim against Scott Brothers' surety bond. The trial court held Cuthbert was not a subcontractor but a materialman and, thus, outside the scope of the bond. We affirmed, stating:

"Under the authorities one who takes no part in the construction of a building, but merely furnishes material for use in a building, is not a subcontractor, and if the claimant is employed to furnish material only, whether fabricated or made ready for use or not, cannot be regarded as a subcontractor." 126 Kan. at 266.

We reasoned:

"Upon plaintiff's theory the liability would be extended not only to the plaintiff for the stone sold to the materialman but the contractor might be liable to those operating the stone quarry where the stone was obtained, and still further, to the owner of the land from which the stone was procured. Such an interpretation of this quasi mechanic's lien law would leave the owner and contractor in a precarious and perilous position indeed, as they could not well know that the claim of some remote person in the material furnished by the materialman, some manufacturer, wholesale dealer or retail dealer, through whose hand the material had passed, had been paid. That view of the act was not, we think, within the purpose of the legislature, but rather that the provision was enacted according to the principles of the mechanic's lien law and should be viewed in the light of its relation to that law." 126 Kan. at 267.

In general, it is appropriate to analogize rules applicable to mechanics' liens to contractors' bonds. *Cedar Vale Co-op Exch., Inc. v. Allen Utilities, Inc.*, 10 Kan. App. 2d 129.

Another case which should be discussed is *Interlake, Inc. v. Kansas Power & Light*, 231 Kan. 251, 644 P.2d 385 (1982). KP&L, expanding a natural gas pipeline in southwest Kansas, issued a purchase order for pipe to Continental Pipe & Tube Corp. and contracted with J & B Construction Company to construct the pipeline. Continental acquired the pipe from Interlake, which shipped the pipe to another KP&L contractor to coat the pipe. Because Interlake was not fully paid, it filed an oil and gas mechanic's lien against KP&L. 231 Kan. at 252.

The trial court held Continental was a contractor, and Interlake was a materialman-subcontractor to Continental and thereby entitled to the mechanic's lien. The Court of Appeals affirmed. We reversed, stating Continental was a materialman because it simply furnished materials under contract with the owner. 231 Kan. at 256. Since Continental was a materialman, Interlake was simply a supplier to a materialman and not entitled to the mechanic's lien.

We based this decision, in part, on the following excerpts from 53 Am. Jur. 2d, Mechanics' Liens:

" '§ 71. Materialmen.

" 'The right to assert a mechanic's lien is now generally extended to materialmen or those persons who supply materials for the structure and have no other connection with the work. But materialmen, to be entitled to a lien, must be specifically referred to within the statute, for it cannot be extended to that class by construction. Thus, materialmen are not generally within the term "contractor" or "subcontractor."

" '§ 72. Contractors or subcontractors distinguished.

" 'In some jurisdictions there is no distinct class of "materialmen." The

statutes confer the right to a lien on persons furnishing materials but designate them as contractors or subcontractors, depending on whether such persons furnish materials to the owner of a structure or to the contractor constructing it. Generally, however, a distinction is made, at least for some purposes, between contractors or subcontractors on the one hand and materialmen on the other, based upon the nature of the person's contract obligation, and materialmen are not generally within the term "contractor" or "subcontractor."

" '*Where a distinction is made between a subcontractor and a materialman, a person, to become a subcontractor rather than a materialman must generally do something more than merely furnish materials.* It has been declared that *he must actually construct with such materials some part of the structure which the contractor has agreed to erect,* although this construction, at least in some jurisdictions, need not be at the jobsite. Thus, the rule is laid down that the essential feature which constitutes one a subcontractor rather than a materialman is that in the course of performance of the prime contract he constructs a definite, substantial part of the work of improvement in accord with the plans and specifications of such contract, not that he enters upon the jobsite and does the construction there.

" '*Accordingly, it is held that one who merely furnishes materials to the owner or a contractor is a materialman, and not a contractor or subcontractor, within the meaning of the mechanic's lien laws* . . . .

" '**§ 73. Suppliers of a materialman or subcontractor.**

"*Persons supplying materials to a materialman* or a subcontractor *must come clearly within the terms of the statute, or they can claim no lien. They are so far removed from the owner that the privilege of a lien is not often extended to them, and the plainest expressions of law must be used to entitle them to this remedy.* Thus, where a construction company, engaged in building a church, placed an order for certain materials required in the construction of the church, understanding that such material would be obtained from a certain manufacturer, the manufacturer of the materials was held to have no right to a lien against the church in which the materials were incorporated. Materialmen in the second degree may, however, be provided for by a statute which expresses with sufficient clearness an intent to this effect. Under some statutes it is stated that a supplier of a materialman is not entitled to a lien but that a supplier of a subcontractor is.' pp. 582-86. (Emphasis supplied.)" 231 Kan. at 255-56.

The discussion in *Indiana Limestone Co. v. Cuthbert*, 126 Kan. 262, as to reasons for excluding remote suppliers (suppliers to suppliers) is even more compelling in view of our present day society than it was in 1928. Specialized equipment of complexity undreamed of in 1928 is routinely manufactured involving components from dozens of suppliers. Modern conditions frequently demand a high degree of specialization in manufacturers and suppliers.

The facts that Welles had the duties to inspect Penta's installation of the components purchased from Welles, to be present at the start-up, and to instruct City of Wichita employees

on the use of the gas compressor system were key factors in the trial court's conclusion that Welles was in fact a subcontractor. But it is clear that such activities are common in the construction of sophisticated systems. The company responsible to the owner for installing the whole system may well not have the expertise to handle every facet of coordinating the components purchased from various suppliers and to train personnel on the operation of every phase of the system. Requiring a representative of the sellers of specialized components to be present for test runs and personnel training are legitimate conditions of sale. The Welles representative sent to the site after Penta's installation of the system for inspection and start-up was aptly described as a "trouble-shooter."

We conclude that the trial court's findings of fact do not support its legal conclusion that Welles was a subcontractor of Penta. Welles was a supplier. Therefore, the trial court's imposition of liability on the contractor's bond was erroneous and must be reversed.

In view of this determination, another issue must be addressed. Thompson had a second alternative claim for relief based on a theory of unjust enrichment. This claim arose from the fact that Penta had paid Welles $263,354 of the contract price of $288,958, leaving a balance of $25,604. The trial court held that even if Thompson could not recover the $36,097 claimed on the bond, it could recover $25,604 on the theory of unjust enrichment. Procedurally, it is a strange situation occasioned, no doubt, by the trial court having adopted, in toto, Thompson's proposed findings of fact and conclusions of law which included both Thompson's primary and "fall-back" positions.

We recently discussed unjust enrichment in *Peterson v. Midland Nat'l Bank*, 242 Kan. 266, 275, 747 P.2d 159 (1987), where we said:

"Restitution and unjust enrichment are modern designations for the older doctrine of quasi-contracts. *Mai v. Youtsey*, 231 Kan. 419, 423, 646 P.2d 475 (1982); *Wheat v. Finney*, 230 Kan. 217, 220, 630 P.2d 1160 (1981). One prerequisite for unjust enrichment is a benefit conferred on the defendant by the plaintiff. *Mai v. Youtsey*, 231 Kan. at 423; 17 C.J.S., Contracts § 6. The substance of an action for unjust enrichment lies in a promise implied in law that one will restore to the person entitled thereto that which in equity and good conscience belongs to him. 17 C.J.S., Contracts § 6."

It is a generally recognized rule of law that, apart from unjust

enrichment or from any special statutory rights and remedies, a subcontractor or supplier who has furnished labor or materials for an improvement has no right to a personal judgment against one not in privity. 53 Am. Jur. 2d, Mechanics' Liens § 418, p. 932. See Annot., 62 A.L.R.3d 288, and cases cited therein.

Restatement of Restitution § 110 (1936) states:

"A person who has conferred a benefit upon another as the performance of a contract with a third person is not entitled to restitution from the other merely because of the failure of performance by the third person."

The basic elements on a claim based on a theory of unjust enrichment are threefold: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value. 12 Williston on Contracts § 1479 (3d ed. 1970). See 66 Am. Jur. 2d, Restitution and Implied Contracts § 4, p. 947.

Under the facts found herein by the trial court, there is no basis for applying the doctrine of unjust enrichment. There simply are no special circumstances to justify its application. Thompson did not change its position to its detriment as a result of any promise implied by law on the part of Penta. There may be other suppliers to Welles in the same situation as Thompson. There could be employees of Welles with valid claims for wages. In fact, Thompson's brief acknowledges that a garnishment by another Welles judgment creditor has been satisfied by Penta during the pendency of this case.

Thompson has a judgment against Welles. If Penta is holding funds belonging to Welles, Thompson may proceed with appropriate post-judgment proceedings to seek to satisfy his judgment in part from such funds.

By virtue of the result reached herein, the remaining issue raised by Penta need not be determined.

The judgment is reversed and the case is remanded for entry of judgment in accordance with this decision.