**MIDWEST GRAIN PRODUCTS, INC., Plaintiff,**

v.

**ENVIROFUELS MARKETING, INC., Defendant.**

**Civ. A. No. 95–2355.**

United States District Court, District of Kansas.

Dec. 3, 1996.

Richard P. Senecal, Duncan–Senecal Law Offices, Atchison, KS, William J. Skepnek, Stevens & Brand, L.L.P., Lawrence, KS, William C. Odle, John H. Calvert, Peter F. Daniel, Lathrop & Gage L.C., Kansas City, MO, for Midwest Grain Products, Inc.

William J. Skepnek, Michael J. Maddox, Stevens & Brand, L.L.P., Lawrence, KS, William D. Nay, Tulsa, OK, for EnviroFuels Marketing, Inc.

## ORDER

EARL E. O'CONNOR, District Judge.

On September 24, 1996, the above-captioned matter came for trial before the court on defendant's counterclaim for quantum meruit relief. After carefully considering the arguments of counsel, the testimony at trial, the exhibits, and the briefing submitted by the parties, the court makes the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

### I. *Findings of Fact*

1. Plaintiff Midwest Grain Products, Inc. ("Midwest") is a Kansas corporation. Midwest is an integrated manufacturer in the business of converting grain into other ingredients, primarily industrial products. Among the products it produces is fuel grade alcohol,

commonly referred to as ethanol. Ethanol is blended with gasoline to create a cleaner burning fuel.

2. Defendant EnviroFuels Marketing, Inc. ("EnviroFuels") is an Oklahoma corporation, with its principal place of business in Tulsa, Oklahoma. During the relevant period, from approximately 1991 until 1995, EnviroFuels engaged in the business of marketing, brokering, and selling ethanol. EnviroFuels does not itself produce ethanol, nor does it own any storage facilities.

3. The parties have stipulated that personal jurisdiction, subject matter jurisdiction, and venue properly lie in this court.

A. *The EnviroFuels/ARCO Contract*

4. In the summer of 1991, EnviroFuels entered into a contract with ARCO Products Company ("ARCO"), a division of Atlantic Richfield Company. The contract provided that EnviroFuels was to supply approximately 21 million gallons of fuel-grade ethanol to ARCO during the contract term. The contract term extended from August 15, 1991, through February 28, 1995, in four distinct "supply periods."

5. Pursuant to the EnviroFuels/ARCO contract, the price ARCO was to pay for the ethanol was fixed at Opis plus a specified number of cents per gallon.

6. During the first supply period, Midwest sold ethanol to EnviroFuels at the EnviroFuels/ARCO contract price before freight, less 7.5%. These sales were on a "spot basis" and did not represent performance under a long term commitment.

7. In the spring of 1992, EnviroFuels and Midwest entered into negotiations to assign EnviroFuels' supply contract with ARCO to Midwest. Under the proposed assignment, Midwest would pay EnviroFuels a commission of 1.5% of the EnviroFuels/ARCO contract price.

8. Ladd Seaberg, president of Midwest, testified that there was risk inherent in entering into a long-term ethanol supply contract. He testified that grain prices are the single largest cost item, comprising 45–65% of the cost. Seaberg further testified that an increase in grain prices increases the cost of production. However, because the price of fuel alcohol tracks the price of gasoline and bears no relationship to the cost of grain, it is very difficult to pass on any higher production costs to the ethanol purchaser. Thus, one of the most significant risks facing Midwest was that the cost of production could significantly increase over the term of the contract without a corresponding increase in the selling price, thereby adversely affecting the profitability of the contract.

9. Seaberg also testified that it is very difficult to hedge the risk for contracts greater than one year in length. He stated that there exist some expensive special hedging techniques that can be employed for a two-year contract, but for a four-year contract "you're really taking a risk right on your own back." Transcript, at 183–84.

10. According to Seaberg, if grain prices had risen during the period of time covered by the ARCO contract as they had during this past year, "we would not have had protection on the supply side and it would have been a very, very large loss." Transcript, at 209.

11. Although Midwest sold ethanol to EnviroFuels during the first supply period on a spot basis at approximately 7.5% "margin" off of the ARCO purchase price, Midwest was not willing to obligate itself to that differential for a three-year period because it could not predict its future production costs. If Midwest was going to commit to a long-term contract, it had to have a much "closer," or smaller, margin.

12. Consequently, Midwest was only willing to agree to a 1.5% margin on its commitment to supply 18 million gallons of ethanol over a three-year period.

13. Although both Midwest and EnviroFuels agreed to assign EnviroFuels' supply contract with ARCO to Midwest, ARCO refused to give its required consent to the proposed assignment.

14. In light of ARCO's refusal, the contract was never assigned.

15. Ultimately, the parties orally agreed that for the remaining three-year period of the supply contract, Midwest would sell the

18 million gallons of ethanol to EnviroFuels at the ARCO price less 1.5%.

16. EnviroFuels purchased ethanol from Midwest in order to fulfill its obligations to ARCO under the last three years of its supply contract.

17. Through Midwest's promise to provide the required ethanol at a price 1.5% below the ARCO price, EnviroFuels was relieved of the risk of rising production costs, and of the risk of having to purchase ethanol to supply the contract at a price above the ARCO price.

18. As a result of the oral agreement between Midwest and EnviroFuels regarding the EnviroFuels/ARCO contract, Midwest received the following benefits from EnviroFuels: a commitment from EnviroFuels to purchase approximately 18 million gallons of ethanol at the ARCO price less 1.5%; and payment of all but $590,000 of the purchase price.

19. In exchange for those benefits, Midwest delivered to EnviroFuels the following consideration: a commitment to sell to EnviroFuels the 18 million gallons of ethanol required by the ARCO contract at the ARCO price less 1.5%; and the sale to EnviroFuels and the delivery to ARCO of the 18 million gallons of ethanol for the EnviroFuels/ARCO contract.

20. Ben Henneke, Jr., president of EnviroFuels, testified that over the course of supply periods 2, 3, and 4, EnviroFuels received from Midwest a 1.5% margin, or roughly $350,000.

21. EnviroFuels did not own any exclusive rights to do business with ARCO, such as a franchise or exclusive brokerage agreement.

B. *The Midwest/ARCO Contract*

22. In the spring of 1994, Midwest entered into a direct contract with ARCO to supply ethanol.

23. EnviroFuels had no part in the negotiation of Midwest's direct contracts with ARCO.

24. Midwest never entered into any agreement, either oral or written, to pay commissions to EnviroFuels on Midwest's sales of ethanol directly to ARCO. Seaberg testified that he had never promised EnviroFuels an annuity or future stream of payments for direct business by Midwest with ARCO.

C. *The Dispute*

25. In December of 1994, Ben Henneke directed Charlie Williams to "slow" payments to Midwest. Ultimately, EnviroFuels withheld payments as "liquidated damages" for non-payment of its purported right to 1.5% of the direct supply contracts between Midwest and ARCO.

26. EnviroFuels admitted that the amount withheld, a sum in excess of $500,-000, was greater than the roughly $60,000 EnviroFuels would have been entitled to at that time if its claim to 1.5% of direct contracts was valid.

27. EnviroFuels also admitted that it did not inform Midwest of its reason for withholding the money.

28. Midwest continued to ship ethanol while EnviroFuels withheld payment.

29. In the spring of 1995, Midwest determined that EnviroFuels had not paid Midwest for ethanol shipments under the EnviroFuels/ARCO contract. Seaberg testified that he contacted Henneke in an effort to collect the funds. Henneke expressed to Seaberg for the first time that he believed EnviroFuels was entitled to an "annuity" in the form of a stream of payments on Midwest's direct supply contracts with ARCO.

30. In a letter to Henneke, Seaberg stated that Midwest considered its direct contracts with ARCO "entirely separate and are not connected to any funds you are holding under the four-year agreement with ARCO Products." In the letter, Midwest demanded immediate payment of the money withheld by EnviroFuels. Seaberg advised Henneke that Midwest would not be paying EnviroFuels any percentages on alcohol sold to ARCO under Midwest's direct contracts.

## II. *Conclusions of Law*

The trial of this matter was limited to defendant's equitable theory of quantum meruit. The elements of a quantum meruit claim were recently summarized by the Kansas Court of Appeals:

> [Q]uantum meruit is an equitable action based on a contract implied in law that is not dependent on the assent of the parties. The basic elements are: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value.

*Haz–Mat Response, Inc. v. Certified Waste Services Limited,* 21 Kan.App.2d 56, 65, 896 P.2d 393, 400 (1995), *rev'd in part on other grounds,* 259 Kan. 166, 910 P.2d 839 (1996) (citing *J.W. Thompson Co. v. Welles Products Corp.,* 243 Kan. 503, 512, 758 P.2d 738, 745 (1988)). The remedy of quantum meruit is therefore based upon the equitable notion that the law will imply a contract to the extent necessary to avoid unjust enrichment by one party to a transaction at the expense of the other.

EnviroFuels' evidence fails to demonstrate that it is entitled to recover under a quantum meruit theory. Although EnviroFuels did confer a benefit upon Midwest (the promise to purchase ethanol from Midwest at the ARCO price less 1.5%), Midwest did not retain the benefit without payment for its value. The evidence is uncontroverted that EnviroFuels received from Midwest the agreed-upon 1.5% for all ethanol deliveries to ARCO made pursuant to the EnviroFuels/ARCO supply contract. In addition, EnviroFuels received from Midwest the commitment to supply ethanol for the remaining three years of the supply contract. Such commitment relieved EnviroFuels of the risk of production costs rising during the course of the EnviroFuels/ARCO contract, which could have resulted in lower or negative profit margins to EnviroFuels. Thus, because Midwest has fully paid EnviroFuels for the benefit EnviroFuels conferred upon Midwest, EnviroFuels has failed to establish any claim to restitution under a quantum meruit theory.

Moreover, EnviroFuels' claim for quantum meruit recovery fails because the implied promise it seeks to establish is contradicted by an express term of the completed contract of the parties. EnviroFuels' claim for quantum meruit recovery is, in effect, a claim that the selling price of the 18 million gallons of ethanol already sold by Midwest to EnviroFuels should be reduced, after the fact, from the EnviroFuels/ARCO price less 1.5%, to the EnviroFuels/ARCO price less approximately 7.5%. From the evidence presented at trial, the court finds that the parties agreed Midwest would sell 18 million gallons of ethanol to EnviroFuels at the ARCO price less 1.5% for the remaining three-year period of the supply contract. The court may not imply an agreement when the terms of the alleged implied agreement are in conflict with the terms of an express agreement. *See Shell Petroleum Corp. v. Shore,* 72 F.2d 193, 195 (10th Cir.1934) (applying Kansas law) (law will not imply a quasi-contract to drill additional "protection" wells where the parties had an express agreement describing the scope of the wells to be drilled). Simply put, EnviroFuels received the 1.5% for which it had bargained; Midwest was not unjustly enriched.

EnviroFuels also seeks quantum meruit recovery on the grounds that it is entitled to commissions on Midwest's direct contracts with ARCO. Essentially, EnviroFuels argues that had it known that its attempted assignment to Midwest of its supply contract with ARCO was not effective, EnviroFuels could have gone into the marketplace and obtained ethanol from other sources at a margin of at least the 7.5% it had obtained from Midwest in the first year of the supply contract. Thus, EnviroFuels maintains that it lost, and is therefore entitled to, 6%, in addition to the 1.5% that it already received. At trial, EnviroFuels' counsel clarified that its claim is limited to damages recoverable only on the last three years of the supply contract.

The court finds that EnviroFuels has failed to establish such entitlement for multiple reasons. First, EnviroFuels' premise that it was unaware that its attempted assignment was ineffective is belied by the facts. As we noted in our summary judgment order entered July 12, 1996, EnviroFuels has admitted that even as late as the very last shipping season of the EnviroFuels/ARCO contract (1994/1995), EnviroFuels was still proposing to ARCO that it accept assignment of the contract. Failure of EnviroFuels' premise renders the whole of its theory untenable.

Second, we find that the April 22, 1992, letter, wherein Henneke proposed the assignment, does not constitute evidence to support EnviroFuels' position. The proposed assignment mentioned in the letter never became effective due to failure of a condition precedent, to wit, ARCO's consent. The mere fact that the parties continued to engage in commerce after ARCO refused to consent did not waive the consent requirement. We find that the language "any successor thereto" contained in the April 22, 1992, letter is not pertinent to any obligation on the part of Midwest. Said language was only contained in the letter, which never resulted in any contractual obligation.

Third, the direct contracts between Midwest and ARCO were not the result of any efforts by EnviroFuels. It is uncontroverted that EnviroFuels undertook no action to assist Midwest in procuring direct contracts with ARCO. Moreover, the evidence indicates that EnviroFuels did not possess any exclusive rights to do business with ARCO, such as a franchise or exclusive brokerage agreement.

In sum, based upon the foregoing, we conclude that EnviroFuels is not entitled to any margin on direct contracts between Midwest and ARCO. Nor is EnviroFuels entitled to any more compensation for the ethanol it purchased from Midwest than the 1.5% margin it has received. Our conclusion on the merits makes moot the question of the admissibility of the proffered damages evidence, as well as Midwest's request for "dispositive sanctions."

IT IS THEREFORE ORDERED that judgment is entered in favor of Midwest on EnviroFuels' counterclaim seeking quantum meruit relief.