IBP, INC., Plaintiff,

v.

**MERCANTILE BANK OF TOPEKA, Meyer Land & Cattle Company, and Sylvan State Bank, Defendants.**

No. Civ.A. 97–2176–GTV.

United States District Court, D. Kansas.

June 2, 1998.

---

Curtis L. Tideman, W. Joseph Hatley, Lathrop & Gage L.C., Overland Park, KS, for IBP, Inc., Plaintiff.

Timothy M. O'Brien, Celia K. Garrett, Shook, Hardy & Bacon L.L.P., Overland Park, KS, for Mercantile Bank of Topeka, Defendant.

David A. Hanson, Larry G. Karns, Glenn, Cornish, Hanson & Karns, Chtd., Topeka, KS, for Meyer Land & Cattle Co., Defendant.

Patricia A. Reeder, R. Patrick Riordan, Woner, Glenn, Reeder & Girard, Topeka, KS, for Sylvan State Bank, Defendant.

David A. Hanson, Larry G. Karns, Glenn, Cornish, Hanson & Karns, Chtd., Topeka, KS, for Meyer Land & Cattle Co., Cross–Defendant.

### MEMORANDUM AND ORDER

VAN BEBBER, Chief Judge.

This case centers around a check cashed more than nine years after its issuance. Plaintiff, which wrote and delivered the check, commenced this action against the customer cashing the stale check, the bank at which the customer completed the transac-

tion, and plaintiff's own bank. The case is before the court on the following:

(1) summary judgment motion of Mercantile Bank of Topeka (Doc. 82);

(2) summary judgment motion of Sylvan State Bank (Doc. 97);·

(3) summary judgment motion of Meyer Land & Cattle Company (Doc. 87) on plaintiff's complaint; and

(4) summary judgment motion of Meyer Land & Cattle Company (Doc. 85) on Mercantile Bank of Topeka's third-party claim;

For the reasons set forth below, the summary judgment motions of Mercantile Bank of Topeka, Sylvan State Bank, and Meyer Land & Cattle Company arising out of plaintiff's complaint are granted. Meyer Land & Cattle Company's motion for summary judgment on Mercantile Bank of Topeka's third-party claim is denied as moot.

## I. Background

The following facts are either uncontroverted or based on evidence viewed in a light most favorable to the nonmoving party. Facts that are immaterial or not properly supported by the record are omitted.

On July 15, 1986, plaintiff IBP, Inc. ("IBP") issued and delivered to defendant Meyer Land & Cattle Company ("Meyer") a $135,234.18 check payable to both Meyer and defendant Sylvan State Bank ("Sylvan") for the purchase of cattle. IBP wrote the check on its account at Mercantile Bank of Topeka ("Mercantile"). IBP included Sylvan as a payee because Sylvan had a security interest in Meyer's cattle. Incredible as it may seem, officials at the closely-held family-run Meyer business apparently misplaced the check.

In the fall of 1995, Meyer president Tim Meyer found the 1986 undeposited check from IBP behind a desk drawer in his home. Although Mr. Meyer knew that the check was nine years old, he did not question its validity and assumed it reflected a payment for a previous sale of cattle.[1] Meyer, through its office manager, Jana Huse, later endorsed the check with the corporation's authorized and accepted endorsement stamp, which bore the name "MLC, Inc.," and pre-

sented the check for deposit at Sylvan. Sylvan's vice-president also endorsed the check on behalf of the bank (as payee) and accepted the instrument for deposit.

Sylvan then forwarded the check to an automated bank clearinghouse (presumably an office of the Federal Reserve System) which, in turn, routed the check to Mercantile. After Mercantile received the instrument and its computers noted the absence of any outstanding stop-payment order, it withdrew $135,234.18 from IBP's checking account and paid the check.

IBP issues thousands of checks on its Mercantile account every month. In the period of July 1995 through December 1995, IBP drew 73,769 checks on the account. In September 1995 alone, the month in which Mercantile processed the 1986 check to Meyer, IBP drew 14,852 checks. For IBP, a $135,234.18 check is not extraordinary as the company issues numerous checks each month for amounts well in excess of $100,000.

Upon learning that its account had been debited for the amount of the check to Meyer, IBP contacted Mercantile and insisted that the bank credit IBP's account. IBP claimed that Mercantile had improperly honored the stale instrument and had an obligation to return the funds to IBP. Mercantile refused. This lawsuit ensued.

Additional facts will be provided as necessary.

## II. Summary Judgment Standards

In deciding a motion for summary judgment, the court must examine any evidence tending to show triable issues in the light most favorable to the nonmoving party. *Bee v. Greaves,* 744 F.2d 1387, 1396 (10th Cir. 1984). A moving party is entitled to summary judgment only if the evidence indicates "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine factual issue is one that "can reasonably be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Anderson v.*

---

1. During the period 1986–1995, Meyer frequently presented checks for deposit at Sylvan involving amounts between $100,000 and $200,000. A $135,234.18 check, therefore, was not unusual.

**1262**

*Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be discharged by "showing" that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Thus, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.*

### III. Discussion

#### A. Meyer's Summary Judgment Motion

IBP alleges that the $135,234.18 check given to Meyer in 1986 was voided two days after its issuance. IBP thus argues that Meyer's cashing of the check in 1995 amounts to conversion and unjust enrichment. The court finds insufficient evidence to support either claim.

#### 1. Conversion

Meyer first insists that IBP's conversion claim is not cognizable under the Uniform Commercial Code ("UCC"). Clarifying prior ambiguities, the 1991 amendments to Kansas' version of the UCC state that "[a]n action for conversion of an instrument may not be brought by ... the issuer or acceptor of the instrument." K.S.A. 84-3-420(a). The rationale for precluding a drawer from maintaining a statutory conversion action is that "[t]he check represents an *obligation* of the drawer rather than the *property* of the drawer. The drawer has an adequate remedy against the payor bank for recredit of the drawer's account for unauthorized payment of the check." K.S.A. 84-3-420 official cmt. 1 (emphasis added).

IBP acknowledges that it has no valid claim for statutory conversion under the UCC. The company insists, however, that it does have an actionable conversion claim un-

der common law. In response, Meyer avers that the UCC supersedes the common law as to the tort of conversion. The initial sentence of K.S.A. 84-3-420, which provides that the "law applicable to conversion of personal property applies to instruments," implicitly incorporates common law conversion. 2 James J. White & Robert S. Summers, *Uniform Commercial Code* § 18-4 at 216 (4th ed.1995). Although this incorporation language suggests that the Code has displaced the common law with respect to this tort, the court need not resolve the issue here. Even if common law conversion survived the enactment of K.S.A. 84-3-420, IBP is unable to prevail on such a claim against Meyer.

Under Kansas law, conversion is defined as "the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights." *Moore v. State Bank of Burden,* 240 Kan. 382, 386, 729 P.2d 1205, 1210 (1986) (citing *Carmichael v. Halstead Nursing Ctr., Ltd.,* 237 Kan. 495, Syl. ¶ 2, 701 P.2d 934 (1985)). Conversion in the banking context ordinarily involves stolen or forged checks that are forwarded through the stream of commerce and ultimately paid by the payor bank. *RPM Pizza, Inc. v. Bank One Cambridge,* 869 F.Supp. 517, 521 (E.D.Mich.1994). A drawer has no right to maintain a common law conversion action because a negotiable instrument is the property of the holder or payee—not the drawer. *Commercial Credit Corp. v. University Nat'l Bank,* 590 F.2d 849, 852 (10th Cir.1979) (citing *Stone & Webster Eng'g Co. v. First Nat'l Bank & Trust Co.,* 345 Mass. 1, 184 N.E.2d 358 (1962)). The drawer is not without a remedy. He may sue the payor bank for negligence or breach of the deposit contract. *See RPM Pizza,* 869 F.Supp. at 521 (citation omitted). Without valuable rights in the check itself, however, the drawer's conversion claim must fail.

In support of its common law conversion theory, IBP relies on *Carmichael,* 237 Kan. 495, 701 P.2d 934. In that case, the Halstead Nursing Center, which operated under the name "Halstead Nursing Center, Inc.," had been one of the prevailing plaintiffs in a class action lawsuit against the Kansas Depart-

ment of Social and Rehabilitation Services. Prior to receiving payment on the judgment, the nursing center changed ownership. The new owners conducted business under a highly similar name—"Halstead Nursing Center, Ltd." The state, upon distributing the judgment funds to the prevailing litigants in the class action, sent a check to the nursing home made out to "Halstead Nursing Center." The new owners did not forward the check to the previous owners but instead deposited the funds into their own account.

The former shareholders of "Halstead Nursing Center, Inc." then filed suit against "Halstead Nursing Center, Ltd." for, *inter alia,* tortious conversion. Focusing on the intent of the issuer of the check, the Kansas Supreme Court held that the new owners of the nursing home had endorsed the instrument without authority, thereby exposing themselves to liability for conversion. *Id.* at 500–01, 701 P.2d at 938–39. Contrary to the representations of IBP, *Carmichael* did not establish that the drawer of a check may maintain a conversion action against a payor bank; nor has the court found a single Kansas case supporting IBP's position. Accordingly, Meyer's motion for summary judgment on IBP's conversion claim must be granted.

### 2. Unjust Enrichment

■ IBP also asserts an unjust enrichment claim against Meyer. IBP contends that its $135,234.18 debt to Meyer had been vitiated by the time Meyer cashed the check in 1995. IBP's claim, however, suffers from a fatal evidentiary deficiency.

■ The foundation for the unjust enrichment cause of action rests in a "promise implied in law that one will restore to the person entitled thereto that which in equity and good conscience belongs to him [or her]." *Haz-Mat Response, Inc. v. Certified Waste Servs. Ltd.,* 259 Kan. 166, 176, 910 P.2d 839, 846 (1996) (alteration in original) (citation omitted). The three requisite elements to such a claim are: "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value." *J.W. Thomp-*

son *Co. v. Welles Prods. Corp.,* 243 Kan. 503, 512, 758 P.2d 738, 745 (1988).

■] IBP argues that it either issued the check erroneously to Meyer in 1986 or extinguished the debt shortly thereafter. IBP makes this form of alternative argument because the company has no accurate records of the circumstances surrounding the issuance or alleged voiding of the check. The only "evidence" IBP offers in support of its theory consists of several unauthenticated documents purportedly showing that the check was not outstanding at the time it was cashed. This does not create a genuine issue of material fact.

■ In a summary judgment response, a nonmoving party need not produce evidence in a form that would be admissible at trial. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548; *Thomas v. IBM,* 48 F.3d 478, 485 (10th Cir.1995). It is well established, however, that a party cannot rely on unauthenticated documents to avoid summary judgment. 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 2722 at 382–84 (3d ed.1998). Thus, business records, which normally would be admissible at trial under the hearsay exception set forth at Fed.R.Evid. 803(6), may be considered only if authenticated by a person through whom the exhibits could be admitted into evidence. *See Duplantis v. Shell Offshore, Inc.,* 948 F.2d 187, 192 (5th Cir.1991); *Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1550–51 (9th Cir.1989); *Martz v. Union Labor Life Ins. Co.,* 757 F.2d 135, 138 (7th Cir.1985); *Cummings v. Roberts,* 628 F.2d 1065, 1068 (8th Cir.1980).

■ Here, as Meyer correctly observes in its summary judgment reply, IBP articulates no foundation for the records attached to its response. In neither his affidavit nor deposition testimony did IBP vice-president Craig Hart give any indication that the records were made contemporaneous with the controverted transaction or were kept in the ordinary course of business. Moreover, Hart conceded that he is not responsible for issuing checks or maintaining records and had no knowledge of the $135,234.18 payment to

Meyer prior to 1995. Although IBP may have officials who can authenticate the materials, the court is under no obligation at the summary judgment stage of proceedings to examine all the hypothetical ways in which evidence could be reduced to an admissible form by the time of trial.[2] *Duplantis,* 948 F.2d at 192.

 Even if IBP could prove with admissible documents that it voided the 1986 instrument within two days after issuance, that point would do little to bolster the company's claim. The fact that a plaintiff has voided a check does not mean, without more, that the plaintiff also eliminated the corresponding debt. If that were the case, dissatisfied business customers could avoid otherwise legitimate obligations merely by cancelling their outstanding checks.

IBP next argues that even in the absence of the records, "the age of the check alone would be sufficient evidence to require a jury trial on the issue of the existence of an underlying debt." The court disagrees. Without competent evidence that IBP had discharged the debt, the fact that Meyer waited an extraordinarily long period of time to cash the check is not sufficient to demonstrate that Meyer has been enriched unjustly. *See Hartsook v. Owens,* 236 Ark. 790, 370 S.W.2d 69, 70 (1963) (UCC policy relieving banks of liability for cashing stale checks in good faith was "adopted for the protection of the bank and plainly do[es] not have the effect of extinguishing a valid obligation" simply because it is stale).

IBP finally avers that Meyer's inability to explain the source of the check or IBP's continuing obligation for the debt mandates a denial of summary judgment. The court rejects this argument as an improper attempt to shift the burden of proof. The Supreme Court made unmistakably clear that the burden is not on the "party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact." *Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. 2548. To the contrary, the movant need only show the district court "that there is an absence of evidence to support the nonmoving party's

case." *Id.* Having satisfied this burden, Meyer is entitled to summary judgment.

### B. Sylvan's Summary Judgment Motion

Turning downstream, IBP asserts conversion, unjust enrichment, and negligence claims against Sylvan, the depositary bank. Sylvan maintains that none of these claims has merit. The court concurs.

#### 1. Conversion

 Sylvan is entitled to summary judgment on IBP's conversion cause of action for largely the same reasons the court granted summary judgment to Meyer on the identical claim. Specifically, both the UCC and common law preclude the drawer of a check from succeeding on a conversion action against the depositary bank for misappropriation of the instrument because the drawer is not the rightful owner of the check. Moreover, because IBP is unable to establish that its debt to Meyer had been discharged at the time Meyer cashed the check in 1995, there is no proof that Sylvan assumed ownership over goods without proper authority.

#### 2. Unjust Enrichment

Sylvan's summary judgment motion on IBP's unjust enrichment claim is granted under the same rationale the court identified in Part III.A.2. above.

#### 3. Negligence

 In its negligence claim against Sylvan, IBP alleges that Sylvan: (1) knew or should have known that IBP already had paid the $135,234.18 debt to Meyer; (2) knew or should have known that IBP's check was stale; (3) failed to require Meyer's proper endorsement; (4) neglected to inform IBP that Meyer had attempted to cash a stale check; and (5) failed to contact IBP prior to paying the check.

The first and third allegations are rejected outright. As noted above, IBP has advanced no evidence that its 1986 debt to Meyer had been discharged by the time Meyer cashed

---

**2.** Strict compliance with this rule is particularly warranted in this case. A sophisticated party like IBP, represented by prominent counsel, is not excused from failing to familiarize itself with procedural rules.

the check in 1995. In addition, IBP conceded in its response to Mercantile's summary judgment motion that "MLC, Inc." represented the proper endorsement for Meyer Land & Cattle Company. The improper payment of a stale check allegations require additional analysis.

No Kansas court has addressed whether a non-payor depository bank owes a duty of care to the drawer of a check to examine the face of the instrument before accepting it for deposit. Neither has the court found a single case from any jurisdiction in which a non-payor depositary bank has been held liable for cashing a stale check. In analogous circumstances, however, nearly every court has reasoned that a bank owes no duty of care to a non-customer with whom it has no relationship.[3] *See Volpe v. Fleet Nat'l Bank,* 710 A.2d 661, 663–64 (R.I.1998) (collecting cases involving fictitious payees and forged indorsements). IBP contends that Sylvan's status as a co-payee on the 1986 check to Meyer puts Sylvan in a "unique relationship" with IBP, thereby implicating a duty of ordinary care. The court disagrees. IBP and Sylvan have no business relationship and have had no substantive communications with each other prior to this lawsuit. IBP placed Sylvan's name on its check to Meyer simply because Sylvan, as Meyer's secured creditor, had a lien on Meyer's cattle. Such a connection is too attenuated to impose upon Sylvan any duties toward IBP.

█ Further, even if Sylvan did owe a duty of ordinary care to IBP and breached that duty by failing to contact IBP prior to cashing the nine-year-old check to Meyer, IBP could not prevail on its negligence claim. To succeed on a negligence claim, a plaintiff must demonstrate that it suffered damages as a proximate result of the defendant's breach of duty. *P.W. v. Kansas Dep't of Social Rehab., Servs.,* 255 Kan. 827, 831, 877 P.2d 430, 434 (1994). Here, as repeatedly noted above, IBP is unable to establish with any competent evidence that it sustained harm as a result of Meyer's cashing the 1986

check in 1995. Duty and breach are irrelevant without a correlative injury. In the absence of such injury, the court grants Sylvan's motion for summary judgment on IBP's negligence claim.

### C. Mercantile's Summary Judgment Motion

At the terminus of the negotiable instrument stream sits the payor bank. IBP contends that the payor bank in this lawsuit—Mercantile—breached its contract of deposit and engaged in negligent conduct by honoring IBP's check to Meyer without first contacting IBP to verify the validity of the instrument. Mercantile insists that it is vulnerable to liability on neither cause of action. The court agrees.

#### 1. Path of the Check

Understanding the path that IBP's check took prior to the ultimate payment by Mercantile will help illuminate the liability issues in this case. In that regard, the court will describe briefly the check-cashing procedures that Mercantile employs with a particular emphasis on "stale" checks and stop-payment orders.

A drawer normally issues its check on a uniform standardized check stock form that bears magnetic ink character recognition ("MICR") encoding. The MICR encoding consists of a check number, the payor bank's American Bankers Association transit routing number, and the drawer's account number. The payee, after endorsing the check, presents the instrument to a bank for payment. The bank of first deposit, denominated a "depositary bank," examines the check and determines from a facial analysis whether the check is properly payable.

Once the depositary bank cashes the check, the bank initiates payment of the instrument by adding the amount of the check to the MICR encoding line in electronically-recognized characters. This act completes

---

**3.** IBP cites *E.F. Hutton & Co. v. City Nat'l Bank,* 149 Cal.App.3d 60, 196 Cal.Rptr. 614 (1983), to support its depositary bank duty argument. That case, which relies on *Sun 'n Sand, Inc. v. United California Bank,* 21 Cal.3d 671, 148 Cal.Rptr. 329, 582 P.2d 920 (1978), has been repudiated by

the UCC, *see* K.S.A. 84–3–417 official cmt. 2, as well as subsequent California state court decisions. *See Roy Supply, Inc. v. Wells Fargo Bank,* 39 Cal.App.4th 1051, 46 Cal.Rptr.2d 309, 325 (1995).

the MICR encoding line. From that point forward, all processing of the check through various banking channels is effectuated through automatic electronic equipment. Thus, under the MICR encoding scheme, the depositary bank is the only situs at which the check is inspected by an individual. sight examination unless the drawer requests "exception item processing." Assuming, as is the case here, the depositary bank is not also the payor bank, the depositary bank sends the MICR-encoded check to an automated bank clearinghouse (presumably a branch of the Federal Reserve System) which routes the check via high-speed processing machinery to the payor bank for payment. The automated collection and payment procedures that Mercantile utilizes rely upon the MICR encoding information to process checks.[4] Accordingly, while acting as a nondepositary payor bank, as it did with respect to the payment of IBP's check to Meyer, Mercantile does not examine checks manually.

### 2. Negligence

IBP avers that Mercantile was negligent because Mercantile: (1) knew or should have known that IBP had extinguished its $135,234.18 debt to Meyer; (2) knew or should have known that IBP's check was stale; (3) failed to require Meyer's proper endorsement; (4) neglected to inform IBP that Meyer sought to cash the stale check; and (5) failed to contact IBP prior to paying the check.

For the same reasons articulated in the analysis of IBP's negligence claims against Sylvan, the court dismisses the first and third allegations without detailed discussion. As to the improper payment of a stale check allegations, the court finds that IBP's contentions must be rejected as well.

### a. Knowledge of IBP's Continuing Obligation

 IBP avers that Mercantile had a duty to ascertain whether IBP's debt to Meyer remained outstanding at the time IBP's check was presented to Mercantile for

payment. The court disagrees. Such a requirement would entail a significantly onerous burden upon banks, particularly those dealing with high volume accounts like. that of IBP. Absent circumstances that reasonably put a bank on notice of an instrument's invalidity, the bank is not responsible for investigating whether checks written on its customers' accounts represent outstanding obligations before paying them.[5] As described below, IBP's check to Meyer did not present the type of unusual scenario triggering such a duty of heightened scrutiny.

### b. Payment of Stale Check

 A bank's obligations with respect to the payment of stale checks are governed by K.S.A. 84-4-404. This statute provides that "[a] bank is under no obligation to a customer having a checking account to pay a check, other than a certified check, more than six months after its date, but *it may charge its customer's account for a payment made thereafter in good faith.*" Id. (emphasis added). "Good faith" is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing." K.S.A. 84-3-103(a)(4) & 84-4-104(c).

·The official UCC comment to K.S.A. 84-4-404, written more than thirty years ago, notes that the "time limit is set at six months because banking and commercial practice regards a check outstanding for longer than that period as stale, and a bank will normally not pay such a check without consulting the depositor." The 1996 Kansas comment to this provision further states that the greatest potential exposure for a bank paying a stale check is the statute's "good faith" language. The legislature heightened the exposure in 1991 by adding "the observance of reasonable commercial standards of fair dealing" to the definition of good faith as part of the incorporation of the 1990 UCC amendments.

IBP insists that Mercantile should have had a system in place by which the bank could detect all checks more than six months old at the time of presentment and verify the

---

4. Stop-payment orders are also processed through automation. The stop-payment order matches a cheek's MICR encoding information and automatically stops payment of the check.

5. Customers can protect themselves adequately by filing and updating stop-payment orders or closing particular accounts.

validity of such instruments before debiting customer accounts. IBP further contends that by relying on depositary banks such as Sylvan to detect stale instruments, Mercantile improperly delegated the duties it owes to customers. Mercantile responds that its check processing procedures adhere to reasonable commercial standards of fair dealing in the banking industry. Mercantile also avers that the only way to discern the staleness of negotiable instruments like IBP's 1986 check to Meyer would be to conduct manual examinations, an extraordinarily expensive and inefficient way of transacting business. The court concurs.

The 1990 UCC amendments explicitly acknowledged the need for automated check processing like the MICR encoding system to maintain efficiency in the banking industry.

In 1950 at the time Article 4 was drafted, 6.7 billion checks were written annually. By the time of the 1990 revision of Article 4 annual volume was estimated by the American Bankers Association to be about 50 billion checks. The banking system could not have coped with this increase in check volume had it not developed in the late 1950's and early 1960's an automated system for check collection based on encoding checks with machine-readable information by Magnetic Ink Character Recognition (MICR). An important goal of the 1990 revision of Article 4 is to promote the efficiency of the check collection process by making the provisions of Article 4 more compatible with the needs of an automated system and, by doing so, increase the speed and lower the cost of check collection for those who write and receive checks. An additional goal of the 1990 revision of Article 4 is to remove any statutory barriers in the Article to the ultimate adoption of programs allowing the presentment of checks to payor banks by electronic transmission of information captured from the MICR line on the checks.

K.S.A. 84–4–101 official cmt. 2 (emphasis added). Yet, the MICR system, upon which

the entire banking system relies, provides no basis for detecting a check's date.

IBP argues that reasonable banking practices must include a disclosure to customers that the bank's check processing procedures have no mechanism to detect a stale check absent a stop-payment order.[6] The only evidence IBP offers in support of this proposition is the affidavit of IBP vice-president Craig Hart. As Mercantile correctly points out, however, Hart conceded in his deposition that he has no personal knowledge of what constitutes "reasonable commercial standards" in the banking industry. Nor does Hart have any personal knowledge of IBP's dealings with Mercantile. In sum, Hart predicates his opinion exclusively on his status as a lay "consumer of banking services." The court does not credit such evidence on the issue of acceptable banking standards. *See* Fed.R.Evid. 602 (witness may not testify to a matter unless there is evidence that he has sufficient personal knowledge of the matter). The personal beliefs and preferences of a bank customer do not represent the standard for a negligence or breach of good faith claim.

Hart's opinions also run contrary to the UCC's definitions of "ordinary care" and "good faith" in the banking industry. Under the UCC,

"[o]rdinary care" in the case of a person engaged in business means observance of reasonable commercial standards; prevailing in the area in which the person is located, with respect to the business in which the person is engaged. *In the case of a bank that takes an instrument for processing for collection or payment by automated means, reasonable commercial standards do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage not disapproved by this article or article 4.*

---

6. To the extent IBP is arguing that Mercantile is negligent for not articulating the limitations of the automated check processing system in customer deposit agreements, the court declines to entertain this claim. IBP did not raise the argument in its complaint or draft pre-trial order and has not requested to amend its pleadings. The court will not permit parties to assert new claims in response to a summary judgment motion.

K.S.A. 84–3–103(a)(7) (emphasis added). "Good faith," defined previously, must be read together with "ordinary care." K.S.A. 84–3–103 official Kansas cmt. "The reasonableness of the 'good faith' is in the entire transaction, while the reasonableness in 'ordinary care' will usually refer to individual events." *Id.* Mercantile's policies do not require the bank to examine all checks manually before debiting customer accounts. Nor do such policies contravene accepted banking procedures specifically outlined in the UCC.

The official commentary accompanying K.S.A. 84–4–404 contemplates that payor banks which honor stale checks often will incur no liability because they are unaware of the staleness.

> Several cases under the former definition of "good faith" in [K.S.A.] 84–1–201(19) held banks liable for paying stale checks under the former section.... Under these cases, a bank may be liable to its customer if it pays a check *known to be very stale* without making some inquiry, especially with the broader current definition of good faith. *Since most checks are run by computer, the drawee bank would be unaware of the staleness unless the check was large enough to merit individual inspection.*

K.S.A. 84–4–404 official Kansas cmt (emphasis added). Here, it is undisputed that Mercantile had no knowledge that the IBP check it honored in 1995 was more than nine years old. It is similarly uncontested that IBP frequently drafted checks of equal or greater value on its account. Furthermore, IBP was cognizant of Mercantile's procedures for seeking a stop-payment order, yet chose not to secure (or at least update) such an order. Under these circumstances, the court concludes that Mercantile exercised good faith and ordinary care in honoring the check without first consulting IBP.[7] *See RPM Pizza,* 869 F.Supp. at 519–21. Mercantile's summary judgment motion on this claim, therefore, is granted.

### 3. Breach of Contract

IBP's final claim is that Mercantile breached its deposit contract with IBP by honoring the stale check to Meyer without verifying the validity of the instrument. The factual basis for this breach of contract claim is not altogether clear. The court concludes, however, that the claim has no merit.

The 1993 deposit agreement between IBP and Mercantile is silent as to Mercantile's obligations in the payment of stale checks. The only part of the agreement even remotely connected to this issue is a statement on stop-payment orders warning customers that such orders are valid for only six months and must be renewed at the end of each period to remain effective. This provision is consistent with K.S.A. 84–4–403. The official comment to that statute states, "When a stop-payment order expires it is as though the order had never been given, and the payor bank may pay the item in good faith under [K.S.A. 84–4–404] even though a stop-payment order had once been given." K.S.A. 84–4–403 official cmt. 6. Because IBP did not have a stop-payment order in effect at the time Mercantile honored the 1986 check, there was no breach of contract.

IBP properly notes that a bank is under an implied contract to disburse money from a customer's account only upon the customer's order and direction. *See, Chilson v. Capital Bank of Miami,* 237 Kan. 442, 444, 701 P.2d 903, 906 (1985). Mercantile did not breach this implied contract. The bank honored the 1986 check at IBP's request. A check, after all, is an order to a bank by a drawer to pay the check out of the drawer's account. *See* K.S.A. 84–3–104(a, f). Moreover, as noted above, Mercantile exercised the requisite good faith and ordinary care in honoring the check. Accordingly, Mercantile is entitled to summary judgment on IBP's breach of contract claim.

### D. Meyer's Summary Judgment Motion on Mercantile's Third–Party Claim

Mercantile's breach of warranty claims against Meyer are effectively mooted by the court's ruling that neither Mercantile nor Meyer is liable to IBP. Accordingly, Meyer's

---

**7.** The primary case upon which IBP relies is *Charles Ragusa & Son v. Community State Bank,* 360 So.2d 231 (La.Ct.App.1978). There is no indication in that decision, however, that the payor bank was unaware of the staleness of the plaintiff's check at the time the bank honored the instrument.

summary judgment on Mercantile's third-party claim is denied as moot.

IT IS, THEREFORE, BY THE COURT ORDERED that the motions for summary judgment of Mercantile Bank of Topeka (Doc. 82), Sylvan State Bank (Doc. 97), and Meyer Land & Cattle Company (Doc. 87), all of which arise out of plaintiff's complaint are granted.

IT IS FURTHER ORDERED that the motion for summary judgment of Meyer Land & Cattle Company (Doc. 85) arising out of Mercantile Bank of Topeka's third-party claim is denied as moot.

Copies of this order shall be mailed to counsel of record for the parties.

**IT IS SO ORDERED.**