**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**J & E SALVAGE COMPANY; John Darlington; Teresa N. Darlington, Executrix of the Estate of Edward Darlington, Defendants–Appellants.**

No. 94–2486.

United States Court of Appeals,
Fourth Circuit.

Argued May 1, 1995.

Decided June 14, 1995.

---

**ARGUED:** Jeffrey Stephen Miller, Jacksonville, NC, for appellants. G. Norman Acker, III, Asst. U.S. Atty., Raleigh, NC, for appellee. **ON BRIEF:** Janice McKenzie Cole, U.S. Atty., Raleigh, NC, for appellee.

Before HALL, WILKINSON, and HAMILTON, Circuit Judges.

Reversed and remanded by published opinion. Judge WILKINSON wrote the opinion, in which Judge HAMILTON joined. Judge HALL wrote a dissenting opinion.

## OPINION

WILKINSON, Circuit Judge:

The issue in this appeal is whether the district court had subject matter jurisdiction over claims brought by the United States against a government contractor regarding the ownership of property purchased at a military surplus auction. Relying on the Contract Disputes Act ("CDA"), 41 U.S.C. § 601 et seq., the district court determined that it lacked jurisdiction over the government's contract claims, yet it allowed additional claims styled as tort actions for "conversion" and "replevin" to proceed. We believe that this entire matter was essentially a contract dispute within the ambit of the Contract Disputes Act, and that the district court lacked jurisdiction to decide it.

I.

On May 19, 1992, appellant J & E Salvage Co. ("J & E") purchased seven lots of shipping and storage containers at a Defense Reutilization and Marketing Officer ("DRMO") surplus auction in Cherry Point, North Carolina. J & E generally bought such containers at government auctions for the purpose of converting them into vats or selling them as scrap metal. This sale was conducted under the terms and conditions of a DRMO "Sale by Reference" pamphlet is-

sued to all potential buyers at the surplus auction. A bill of sale, titled as a "Notice of Award," was also issued by the DRMO to J & E at the time of purchase.

Unbeknownst to either J & E or the DRMO, the storage bins purchased at the auction contained four CH–46 helicopter transmissions. J & E discovered the transmissions roughly two or three weeks after the sale. John Darlington, one of the partners in J & E, contacted Alice Martin, the DRMO sales contracting officer, and notified her about the transmissions. Martin and several other DRMO officials asked Darlington to return the transmissions, but he refused, arguing that J & E had lawfully purchased them at the Cherry Point auction.

The United States then brought this action in federal district court in the Eastern District of North Carolina to recover the transmissions. The government alleged several causes of action, including rescission of the contract because of mutual mistake of fact, conversion, and replevin. In reply, J & E argued that the district court lacked subject matter jurisdiction over the government's case because the matter belonged within the exclusive province of the administrative scheme established by the Contract Disputes Act. Acting upon the recommendations of a magistrate judge, the district court concluded that it had jurisdiction over the government's "tort" claims of conversion and replevin, but not over the contract claim for mutual mistake of fact. The court then proceeded to reach the merits of the case, finding that the United States was the true owner of the transmissions, and granted summary judgment in favor of the government. J & E now appeals.

## II.

### A.

Federal jurisdiction over civil actions initiated by the United States government is provided by 28 U.S.C. § 1345, which states:

> Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress.

28 U.S.C. § 1345 (1993). Thus, federal courts have jurisdiction over any case brought by the United States as a plaintiff unless Congress has "otherwise provided" for jurisdiction elsewhere.

One area in which Congress has so "otherwise provided" is the Contract Disputes Act, 41 U.S.C. § 601 et seq. (1988). The Contract Disputes Act is a comprehensive statutory scheme for resolving contractual conflicts between the United States and government contractors. It applies, *inter alia,* to actions involving "any express or implied contract ... entered into by an executive agency for ... the disposal of personal property." 41 U.S.C. § 602. Under the CDA, government claims against a contractor must first be the subject of a decision by the contracting officer, defined as "any person who ... has the authority to enter into and administer contracts and make determinations and findings with respect thereto." 41 U.S.C. §§ 601(3), 605(a). The decision by the contracting officer may be appealed to an agency board of contract appeals or to the United States Court of Federal Claims. 41 U.S.C. §§ 607(d), 609(c). Further appeals from these bodies must be filed with the United States Court of Appeals for the Federal Circuit. 41 U.S.C. § 607(g)(1); *see United States v. Rockwell International Corp.,* 795 F.Supp. 1131, 1134 (N.D. Ga.1992).

■ The review procedures under the CDA are exclusive of jurisdiction in any other forum. 41 U.S.C. § 605(b); *see also Management Science America, Inc. v. Pierce,* 598 F.Supp. 223, 225 (N.D.Ga.1984), *aff'd,* 778 F.2d 792 (11th Cir.1985). Thus, federal district courts lack jurisdiction over government claims against contractors which are subject to the CDA. *See* S.Rep. No. 1118, 95th Cong., 2d Sess. 10, *reprinted in* 978 U.S.C.C.A.N. 5235, 5244 (noting that "U.S. district court jurisdiction is eliminated from Government contract claims").

■ In order to determine whether the CDA applies, federal courts generally look to whether the dispute at issue is one of contract. *See Ingersoll–Rand Co. v. United*

*States,* 780 F.2d 74, 76 (D.C.Cir.1985). The court in *Megapulse, Inc. v. Lewis,* 672 F.2d 959 (D.C.Cir.1982), stated that courts should attempt "to make rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds." 672 F.2d at 969–70. The *Megapulse* court further noted that when examining "competing" jurisdictional bases, the issue is "to determine if the claim so clearly presents a disguised contract action that jurisdiction over the matter is properly limited to the Court of Claims."[1] *Id.* at 968.

It is well-established therefore that disguised contract actions may not escape the CDA. *See, e.g., Ingersoll–Rand,* 780 F.2d at 77; *American Science & Engineering, Inc. v. Califano,* 571 F.2d 58, 61 (1st Cir.1978). Neither contractors nor the government may bring a contract action in federal district court simply by recasting claims in tort language or as some statutory or regulatory violation. *See Sealtite Corp. v. General Services Admin.,* 614 F.Supp. 352, 354 (D.Colo. 1985) (rejecting attempt to "circumvent the [CDA] by characterizing dispute as an action in replevin"). Effective enforcement of the jurisdictional limits of the CDA mandates that courts recognize contract actions that are dressed in tort clothing.

### B.

■ This action by the United States is essentially one of contract, despite the government's efforts to present it as a tort case. The crux of the case rests on a specific contract—the bill of sale between J & E and the DRMO. The merits question presented is one of contract interpretation, *i.e.,* did the bill of sale and the accompanying DRMO sales pamphlet allow a transfer of ownership of the hidden transmissions along with the containers purchased at the auction. This is a classic "scope of the contract" issue. *See International Engineering Co. v. Richardson,* 512 F.2d 573, 578 (D.C.Cir.1975), *cert. denied,* 423 U.S. 1048, 96 S.Ct. 774, 46

L.Ed.2d 636 (1976); *see also* John Calamari & Joseph M. Perillo, Contracts § 3–10 (3d ed.1987). In order to decide this question, it is impossible to ignore the terms of the contract documents surrounding the sale. For example, the DRMO sales pamphlet specifically states that all property sold at auction is "as is." On the other hand, the bill of sale lists the items sold as "containers" and makes no reference to transmissions. The meaning of these provisions controls the outcome of this case. Hence, "it is possible to conceive of this dispute as entirely contained within the terms of the contract." *Ingersoll–Rand,* 780 F.2d at 78.

Alternatively, the question could be phrased as whether the sale was void for unilateral or mutual mistake of fact. Again, however, the source of the rights the government seeks to vindicate are rooted firmly in contract. *See Megapulse,* 672 F.2d at 968. Mistake of fact, the government concedes, is unquestionably a contract doctrine. *See* Calamari, Contracts § 9–26.

Every aspect of this case relates to these contract questions. All the evidence gathered during the discovery process dealt with the documents generated during the sale, the conduct of the auction, and the authority of the DRMO to enter into sales contracts. Furthermore, the dispute involves issues of custom and practice in government auctions. J & E contends, for example, that it is commonly understood that auction purchases of "containers" include whatever may happen to be in the containers. This matter therefore calls for background in the field of government contracting—a subject within the unique expertise of the Court of Claims. *Ingersoll–Rand,* 780 F.2d at 78.

Perhaps most telling of all, the briefs of the parties allude over and over to the contractual issues that govern this dispute. In addition to arguing at length that either a unilateral or mutual mistake of fact prevented the formation of a contract, the govern-

---

1. This mode of analysis was developed in the parallel context of contractor claims against the government through 28 U.S.C. § 1346, as opposed to the § 1345 action in this case. Both situations, however, deal with the identical question of the applicability of the CDA. Thus, we find

that the *Megapulse* analysis is equally pertinent in the setting of government claims against contractors. *See* S.Rep. No. 1118, *reprinted in* U.S.C.C.A.N. at 5260 (noting intent of Congress is to provide "equal rights" under the CDA to both the government and contractors).

ment refers repeatedly to questions about party "intent," "meeting of minds," the "binding force of the contract," and the "terms of the sale," and relies heavily on contract cases. Likewise, the government argues extensively about why these rules of contract law should apply to government contracts generally and this case in particular, apparently blind to the contradiction between its position on the merits and its jurisdictional contention that this is not a contract case. *See Manshul Construction Corp. v. United States,* 687 F.Supp. 60, 62 (E.D.N.Y.1988) ("[P]etitioner, despite strenuous efforts to avoid doing so, occasionally lapses into language that reveals the fundamentally contractual origins of the [case]").

The district court also acknowledged that this is at heart a contract case when it noted that the "only real dispute is whether the United States is the true owner of the transmissions," and then proceeded to answer that question by looking to contract law. The court's opinion granting summary judgment, like the government's brief, is replete with references to contract issues and the contractual documents at the center of this controversy. In particular, the district court relied on theories of "void versus voidable" contracts, mistake of fact, and the doctrine of "unknown contents," and ultimately held that "no valid contract was formed to sell the transmissions."

The district court also rejected the government's claim for punitive damages, which is another factor suggesting that the case was more an action in contract than in tort. Moreover, the principal remedy sought by the government and granted by the district court was rescission of the sale and the return of the transmissions. This was, of course, a contract remedy. *See Ingersoll–Rand,* 780 F.2d at 79–80 (CDA controls when party is seeking contract remedy).

■ The government's claims of "conversion" and "replevin" are merely transparent reformulations of the contract dispute. A

tort claim of conversion requires showing some unauthorized act of control over property belonging to another. *See United States v. Stockton,* 788 F.2d 210, 216 (4th Cir.), *cert. denied,* 479 U.S. 840, 107 S.Ct. 147, 93 L.Ed.2d 89 (1986). In this case, arguing that J & E "converted" the transmissions is the same thing as saying that the transmissions were not covered by the bill of sale. Of course, the mere fact that a court has to decide some contract issues in the course of resolving a tort action does not automatically convert the claim into one sounding in contract if there is some independent basis for the tort claim. *Megapulse,* 672 F.2d at 969. *See also Restatement (Second) of Contracts* § 355 (1981). Here, however, there is no independent basis for a tort. The contract between the parties is the alpha and omega of this dispute. Because the government's allegations are no more than cloaked contract claims, they belong in the Court of Claims under the CDA, and the district court lacked jurisdiction over them.[2]

### C.

Finally, several important considerations counsel against overly narrow definitions of what qualifies as a "contract action" for purposes of the CDA. First, allowing the government to attack contracts of sale with private parties by manufacturing tort claims undermines the express intent of Congress to reduce and simplify disputes over the sale of surplus government property. *See* 40 U.S.C. § 484. The statutory provisions governing the disposal of government property indicate, for instance, that bills of sale are to be conclusive evidence of title, thereby providing some measure of certainty to private purchases of government material. 40 U.S.C. § 484(d). Converting claims into tort actions side-steps these rules, and thus must be discouraged.

Second, respect for the jurisdictional route set forth in the CDA avoids the inefficiencies involved in splitting an action between two

---

**2.** The district court relied heavily on *Megapulse,* which found the action therein was not a disguised contract claim. We think that the *Megapulse* analysis supports the result reached here. The facts of *Megapulse,* however, are different

from the instant case. There, the dispute arose *prior* to the contract, no contract remedy was sought, and several independent statutory issues were presented. That case was more than simply a tort reformulation of a contract dispute.

different forums. As the district court acknowledged, the core contract question belongs in the Court of Federal Claims. Taking up the same claim in federal district court merely because an artful pleader is able to term it a tort significantly increases the costs of litigation for the government, the private contractor, and the judicial system. Circumvention of the CDA's jurisdictional mandate scatters government contract claims across the judicial landscape. If the case can be resolved on a contract basis in the Claims Court, the most efficient procedure is to dismiss any phantom "tort" allegations tacked on to the contract claim.

Third, by calling contract actions what they truly are and enforcing the jurisdictional limits of the CDA, we effectuate Congress' intent to employ the expertise of the Court of Claims in these matters. For example, in addition to questions about auction customs, this case raises issues about the meaning of "surplus property" under 40 U.S.C. §§ 472(g) and 484(d), DRMO property disposal procedures, the extent of DRMO authority, and the proper interpretation of DRMO sales pamphlet terms. As noted above, the Court of Claims has specialized experience regarding the intricate world of government contracting. Congress believed that issues like the ones presented here will be most accurately and consistently resolved by a tribunal dedicated to this particular subject. This case provides a good example of the kind of government contract action that belongs within the specialized scheme provided by the CDA.

### III.

For the foregoing reasons, the judgment of the district court is reversed and remanded with instructions to grant defendant's motion to dismiss the action for want of subject matter jurisdiction. Nothing herein shall prevent a transfer of this action to a proper forum under the provisions of 28 U.S.C. § 1631, if the district court finds such transfer appropriate.

*REVERSED AND REMANDED.*

K.K. HALL, Circuit Judge, dissenting:

As the majority readily acknowledges, *ante* at 989, an unauthorized act of control over property belonging to another constitutes the tort of conversion. When John Darlington telephoned Alice Martin, the sales contracting officer at DRMO, to tell her that he had discovered the transmissions, Martin told Darlington that J & E should give them back. Within a few days, another DRMO representative called Darlington to repeat Martin's request. These conversations were followed by a written demand for the transmissions' return.

If the transmissions belonged to DRMO, then J & E's failure to return them was a conversion—and thus a tort. Although settling the issue of ownership in this case would necessarily involve examining the contract between J & E and DRMO, such an examination does not transmogrify a tort claim into a contract claim. J & E has now returned the transmissions; the only substantial issues that remain are whether the government owned them, and, if so, the damages to which it is entitled as a result of J & E's tortious conduct.

The Court of Claims, though proficient in settling contract disputes, is powerless to decide tort cases. *See, e.g., Transcountry Packing Co. v. United States,* 215 Ct.Cl. 390, 568 F.2d 1333, 1336 (1978) ("This court ... does not have jurisdiction over tort claims.") (citation omitted). Today, the majority remarkably announces that such cases are likewise outside the reach of the district court. Although Lewis Carroll might have fancied such a result, I do not.

I respectfully dissent.