**TRADESMEN INTERNATIONAL, INC., Plaintiff,**

v.

**UNITED STATES POSTAL SERVICE and LOCKHEED MARTIN CORPORATION, Defendants.**

**No. 02–2183–JWL.**

United States District Court, D. Kansas.

Nov. 1, 2002.

Samuel P. Logan, Foulston, Siefkin LLP, Overland Park, KS, for Plaintiff.

Christopher Allman, Office of United States Attorney, Kansas City, KS, for U.S. Postal Service.

William J. DeBauche, John M. Waldeck, Michelle D. Geno, Niewald, Waldeck & Brown, P.C., Kansas City, MO, Daniel J. King, Natalie McDaniel, King & Spalding, Atlanta, GA, for Lockheed Martin Corporation.

## MEMORANDUM & ORDER

LUNGSTRUM, District Judge.

This is an action by a subcontractor to recover amounts due for labor provided by it on a federal postal facility construction project. The United States Postal Service ("Postal Service") entered into a $73 million contract with Lockheed Martin Corporation ("Lockheed Martin") to supply and install automated parcel sorting equipment, known as Singulator Scan Induction Units ("SSIUs"), at various locations including Springfield, Massachusetts and Kansas City, Missouri. Lockheed Martin subcontracted with WestPac Electric, Inc. ("WestPac") to install a portion of the equipment. WestPac, in turn, sub-subcontracted with Tradesmen International, Inc. ("Tradesmen") to provide labor to West-Pac. Tradesmen asserts that it provided labor for WestPac, yet WestPac failed to pay Tradesmen $86,624.32 that Tradesmen alleges it is owed in accordance with their contract. According to Tradesmen, West-Pac is now insolvent and judgment proof. Thus, Tradesmen brought this action against the Postal Service and Lockheed Martin in an attempt to recover the

$86,624.32 it alleges it is owed. In Count I of the complaint, Tradesmen brings an unjust enrichment claim against the Postal Service and Lockheed Martin. Count II is a third-party beneficiary breach of promise claim against Lockheed Martin. Finally, in Count III Tradesmen seeks an equitable lien on funds retained by the Postal Service and Lockheed Martin.

The matter is before the court on defendants Postal Service and Lockheed Martin's motions to dismiss. Specifically, the Postal Service seeks to dismiss Tradesmen's first amended complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. 22). Lockheed Martin seeks to dismiss Tradesmen's first amended complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. 27). For the reasons set forth below, the Postal Service's motion to dismiss for lack of subject matter jurisdiction is granted and Lockheed Martin's motion to dismiss for failure to state a claim is granted as to Count II and granted with leave to amend Counts I and III in an attempt to cure deficiencies in the claims, to the extent set forth below, on or before November 29, 2002.

## II. Motion to Dismiss Standards

The Postal Service and Lockheed Martin's motions to dismiss implicate both Rules 12(b)(1) and 12(b)(6). The standard for each is distinct.

### A. Standard for Rule 12(b)(1) Motion to Dismiss

Federal courts have limited jurisdiction, and the court thus presumes that there is no jurisdiction unless the party invoking it makes an adequate showing that it exists. *United States ex rel. Holmes v. Consumer Ins. Group*, 279 F.3d 1245, 1249 (10th Cir.2002) (citing *United States ex rel. Precision Co. v. Koch Indus.*, 971 F.2d 548, 551 (10th Cir.1992)). The party seeking to invoke federal jurisdiction bears the burden of alleging and proving by a preponderance of the evidence the facts necessary to support jurisdiction. *Id.* (citing *Koch Indus.*, 971 F.2d at 551). A court "lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Gadlin v. Sybron Int'l Corp.*, 222 F.3d 797, 800 (10th Cir.2000) (citations omitted).

Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction generally take the form of either facial attacks on the complaint or factual attacks on the accuracy of those allegations. *Holt v. United States*, 46 F.3d 1000, 1002–03 (10th Cir.1995) (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). The motion of defendant Postal Service falls within the former category because it does not rely on evidence outside the complaint.

### B. Standard for Rule 12(b)(6) Motion to Dismiss

The court will dismiss a cause of action for failure to state a claim only when "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief," *Poole v. County of Otero*, 271 F.3d 955, 957 (10th Cir.2001) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)), or when an issue of law is dispositive. *Neitzke v. Williams*, 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). The court accepts as true all well-pleaded facts, as distinguished from conclusory allegations, and all reasonable inferences from those facts are viewed in favor of the plaintiff. *Smith v. Plati*, 258

F.3d 1167, 1174 (10th Cir.2001). The issue in resolving a motion such as this is "not whether [the] plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 997, 152 L.Ed.2d 1 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

## III. Analysis

The Postal Service seeks to dismiss Trademen's first amended complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. Lockheed Martin seeks to dismiss the first amended complaint for failure to state a claim upon which relief can be granted. If the court lacks subject matter jurisdiction, it of course is powerless to decide the merits. Accordingly, the court first turns to the Postal Service's motion to dismiss for lack of subject matter jurisdiction.

### A. Subject Matter Jurisdiction

■ The Postal Service's motion raises the issue of whether a federal district court has the power to exercise jurisdiction over a subcontractor's suit against the Postal Service. The Postal Service argues that the principle of sovereign immunity precludes Tradesmen from maintaining an action against the Postal Service in this court. The court agrees and, therefore, concludes that this court lacks subject matter jurisdiction over Tradesmen's claims against the Postal Service.

■ Congress created the United States Postal Service pursuant to the Postal Reorganization Act of 1970 ("PRA"), 39 U.S.C. § 101 *et seq.* By including a "sue and be sued" clause in that act, Congress provided a broad waiver of sovereign immunity for the Postal Service, thereby exposing the Postal Service to suit. *Fran-* *chise Tax Bd. v. United States Postal Serv.*, 467 U.S. 512, 517–18, 104 S.Ct. 2549, 81 L.Ed.2d 446 (1984). As the Supreme Court explained, it is presumed that "when Congress launches a government agency into the commercial world and endows it with authority to 'sue and be sued' that agency is no less amenable to judicial process than a private enterprise under like circumstances." *Id.*

■ This presumption, however, can be overcome where the waiver of sovereign immunity conflicts with a "statutory scheme" or where "plain congressional intent" points toward a restrictive reading of the waiver. *Active Fire Sprinkler Corp. v. United States Postal Serv.*, 811 F.2d 747, 752 (2d Cir.1987) (citing *Franchise Tax Bd.*, 467 U.S. at 517–18, 104 S.Ct. 2549); *see also Carroll v. United States Postal Serv.*, 764 F.Supp. 143, 144 (E.D.Mo.1991); *Eastern, Inc. v. Shelly's of Delaware, Inc.*, 721 F.Supp. 649, 650 (D.N.J.1989). The Supreme Court has held, in a variety of contexts, that a "precisely drawn, detailed statute" preempts more general remedies. *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 834–35, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976). Applying such reasoning, the Postal Service argues that the subsequent enactment of the Contracts Dispute Act of 1978 ("CDA"), 41 U.S.C. § 601 *et seq.*, by Congress is evidence of a "statutory scheme" or "plain congressional intent" which requires a restrictive reading of the waiver provision of the PRA. Therefore, this exception to the broad waiver of sovereign immunity, according to the Postal Service, preempts this court's jurisdiction over the present action.

The CDA "applies to any express or implied contract ... entered into by an executive agency for— (1) the procurement of property, other than real property in being; (2) the procurement of services; (3) the procurement of construction,

alteration, repair or maintenance of real property; or (4) the disposal of personal property." 41 U.S.C. § 601(2). The CDA expressly states that the Postal Service is an "executive agency" covered under its terms. 41 U.S.C. § 601(2). In addition to its broad scope, the CDA provides detailed procedures for adjudicating government contract disputes. "All claims by a contractor against the government relating to a contract" covered by the CDA must be submitted first to the contracting officer for a decision. 41 U.S.C. § 605(a). The contracting officer's decision on the claim "shall be final and conclusive and not subject to review by any forum, tribunal, or Government agency, unless an appeal or suit is timely commenced as authorized by this chapter." 41 U.S.C. 605(b). The CDA provides that appeals may be made only to the appropriate agency board of contract appeals or directly 'to the United States Court of Federal Claims ("the Claims Court"), 41 U.S.C. § 606, 609(a)(1) & (3), and either way, the subsequent appeal must be made to the Federal Circuit. 41 U.S.C. § 607(g)(1), 28 U.S.C. §§ 1295(a)(3) & (10).

The Postal Service points to the decisions of the Fourth Circuit in *United States v. J & E Salvage Co.*, 55 F.3d 985 (4th Cir.1995), the Sixth Circuit in *Campanella v. Commerce Exchange Bank*, 137 F.3d 885 (6th Cir.1998), and the District of Columbia Circuit in *A & S Council Oil Co., Inc. v. Lader*, 56 F.3d 234 (D.C.Cir.1995), in arguing that the CDA divests this court of jurisdiction over Tradesmen's claims here. While those decisions persuade the court that exclusive jurisdiction lies with either the appropriate agency board of contract appeals or the Claims Court over contract claims brought by contractors that fall within the ambit of the CDA, the analysis here must go a step further. In those cases a contractor brought a claim against an agency of the United States;

therefore, the issue was whether either the appropriate agency board of contract appeals or the Claims Court had exclusive jurisdiction over claims falling under the CDA such that the district court was divested of jurisdiction to decide the claims.

■ Here, in contrast, it is the subcontractor that is suing the Postal Service. The CDA applies only to contractors, not subcontractors. *Eastern*, 721 F.Supp. at 651. Thus, the court is confronted with the more difficult task of determining whether the CDA preempts whatever jurisdiction federal district courts previously had under the PRA. Put another way, the court must determine whether the CDA preempts the entire field of government contract remedies such that a subcontractor is prevented from availing itself of the "sue or be sued" clause of the PRA to obtain jurisdiction to file an action against the Postal Service in district court. The court concludes that it does.

Courts deciding this particular issue are split. Several district courts have held that the CDA preempts the "sue and be sued" clause of the PRA, thereby restoring the sovereign immunity of government agencies to actions by subcontractors in district court. *Fortna, Inc. v. United States Postal Serv.*, 2000 WL 33119416 (E.D.Pa. Dec.29, 2000); *Biebel Bros., Inc. v. United States Postal Serv.*, 772 F.Supp. 1117 (E.D.Mo.1991); *Carroll v. United States Postal Serv.*, 764 F.Supp. 143 (E.D.Mo.1991); *Eastern*, 721 F.Supp. 649 (D.N.J.1989). By contrast, the Ninth Circuit rejected that proposition in *Wright v. United States Postal Serv.*, 29 F.3d 1426 (9th Cir.1994). After considering the analysis in each of the opinions, the court concludes that the Tenth Circuit likely would follow the reasoning of the district court opinions and hold that the CDA's preemption of district court jurisdiction ex-

tends to actions brought against government agencies, such as the Postal Service, by subcontractors like Tradesmen.

In *Eastern,* the court explored the purpose of the CDA. 721 F.Supp. at 651. The court explained that the CDA was enacted by Congress "to cure the ills associated with the prior system of government contract dispute resolution." *Id.* The prior system, in which claims could be brought in a variety of forums, was often "too expensive and time consuming for the efficient and cost-effective resolution of small claims." S.Rep. No. 1118, 95th Cong., 2d Sess. 4, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5235, 5238. The new framework under the CDA, in which all contract-related claims must be brought in either the appropriate agency board of contract appeals or the Claims Court, was adopted because it was believed to be more efficient in terms of time and money. *Id.* And Congress reasoned that the efficiency, in turn, would lead to the creation of government contracts. *Eastern,* 721 F.Supp. at 651. Thus, in *Eastern* the court concluded that the purpose of the CDA was to facilitate "both contract dispute resolution and the formation of government contracts." *Id.*

Permitting subcontractors to sue in district court would contravene the purpose of the CDA. As the court in *Eastern* explained:

It is indeed true . . . that the provisions of the CDA do not apply to subcontractors. *See* S.Rep. No. 1118, 95th Cong., 2d Sess. 16–17, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5235, 5250–51. At the same time, however, Congress could not have expected subcontractors to have access to district courts after it closed the doors of district courts to contractors. The twin aims of the CDA reflect Congress' desire to eliminate the unnecessary costs arising from government contracts. Permitting

subcontractors to bring actions against the USPS in district court, however, would increase these costs in several ways. First, an executive agency that has entered into a contract with a general contractor would potentially be subject to suit by dozens of subcontractors in district court, which, as the CDA indicates, Congress views as an inefficient forum for resolution of contract-based problems. Second, allowing subcontractors to proceed in district court would frustrate the formation of government contracts. The spectre of dozens of subcontractors bringing actions against a governmental agency in district court may very well chill the agency's enthusiasm to enter into contracts. *Id.* In short, after considering the purpose of the CDA, this court concludes that it is highly unlikely that Congress intended to streamline claims by contractors while at the same time permit subcontractors to continue to bring claims against the government in district court.

This court's conclusion is bolstered by the legislative history of the CDA. It establishes that Congress intended for subcontractors to recover through means other than suing a government agency in district court. That is, Congress intended for subcontractors to continue to pursue their claims against the government through the sponsorship approach. "The sponsorship rules were the 'pre-CDA practice by means of which a subcontractor, otherwise lacking a privity relationship with the government, came into privity with the government by prosecuting its claim through and under its prime contractor's contract with the government." *Id.* at 652. In excluding subcontractors from the provisions of the CDA, Congress envisioned subcontractors bringing actions against the executive agencies through sponsorship. S.Rep. No. 1118, 95th Cong.,

2d Sess. 16–17, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5235, 5250–51.[1]

The fact that Congress retained the sponsorship rules as opposed to permitting subcontractors to sue the government directly under the CDA provides further support for the court's conclusion. Congress explained its rationale for this approach:

There are a number of advantages in the present sponsorship approach. From the Government's point of view, the sponsorship approach is the best method of administering complex procurements. By administering its procurement through a single point of contact, the Government's job is made both simpler and cheaper. The single point of contact approach also helps suppress frivolous claims.... Finally, by denying the subcontractors direct access to administrative remedies, the Government is forcing the prime contractor and the subcontractor to negotiate their disputes. Allowing direct access would eliminate some incentive to negotiate a settlement. This might result in additional time-consuming and expensive litigation.

S. Rep. No. 1118, 95th Cong., 2d Sess. 16–17, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5235, 5250–51. As the court in *Eastern* pointed out, this language clearly indicates that Congress believed it would be an inefficient use of judicial resources and administrative economy to permit subcontractors to proceed directly against the government. 721 F.Supp. at 652. Thus, Congress foreclosed subcontractors from participating in the CDA framework. Permitting subcontractors to sue in district court would produce the same concerns Congress sought to avoid; therefore, it is reasonable to conclude that Congress did not intend to allow subcontractors to sue in district court. *Id.*

Finally, the express language of the CDA supports the court's position that the CDA preempts the PSA's "sue and be sued" clause. Section 602(a) of the CDA states that "this chapter applies to any express or implied contract... entered into by an executive agency...." This sweeping language indicates that the CDA encompasses all government contract disputes. While the legislative history and express terms of the CDA are clear that subcontractors are not within the CDA's framework, the broad language indicates an intention by Congress to streamline all government contract remedies and vest exclusive jurisdiction over such claims in either the appropriate agency board of contract appeals or the Claims Court. This position is consistent with the legislative history indicating that Congress intended for subcontractors to avail themselves of the sponsorship approach as opposed to being permitted to sue the government directly in their own name.

In sum, the combination of the broad scope of the CDA and the clear intention by Congress, as expressed in the legislative history, to streamline the means by which the government can be sued on procurement contracts leads this court to conclude that Congress intended for the CDA to preclude district courts from asserting

---

**1.** A second route the court in *Eastern* discussed is suing the contractor and its surety under the Miller Act. The Miller Act, 40 U.S.C. §§ 270a–270d, which is applicable to the Postal Service through 39 U.S.C. § 410(b)(4)(B), was enacted to protect subcontractors who supply labor and materials in the performance of federal construction projects. The act protects subcontractors by requiring contractors to provide a payment bond to which unpaid subcontractors may turn for their payment. In this case, however, the Postal Service omitted the language requiring such a bond from its contract with Lockheed Martin. Thus, Lockheed Martin did not purchase a Miller Act bond.

jurisdiction over claims by subcontractors, like Tradesmen's here, against the Postal Service.[2]

The Ninth Circuit's opinion in *Wright*, 29 F.3d 1426, as Tradesmen points out, is contrary to the court's holding. Further, as Tradesmen also points out, the Ninth Circuit's opinion is the lone Circuit Court opinion deciding the issue of whether the CDA preempts the entire field of government contract remedies. This factor, however, is discounted by the fact that *Wright* was premised on the Ninth Circuit's previous holding in *Concrete Tie Inc. v. Liberty Construction, Inc. (In re Liberty Construction, Inc.)* 9 F.3d 800 (9th Cir.1993).[3]

In *Liberty Construction*, the Ninth Circuit was confronted with the issue of whether the CDA nullifies other jurisdictional bases for contract-related claims and vests exclusive jurisdiction over such claims in either the appropriate agency board of contract appeals or the Claims Court. *Id.* at 801. The court concluded that the CDA did not preempt a contractor from bringing an indemnification action against the Small Business Administration ("SBA") under the "sue and be sued" provision of the Small Business Act, 15 U.S.C. § 634(b)(1). *Id.* at 801–02. While at the time *Liberty Construction* was decided it may have been consistent with other courts that decided the issue, the Fourth, Sixth and District of Columbia Circuits

have subsequently decided the same issue the other way, holding that the CDA vests exclusive jurisdiction over contract-related claims against government agencies falling within the CDA framework with either the appropriate agency board of contract appeals or the Claims Court. *J & E Salvage Co.*, 55 F.3d at 985; *Campanella*, 137 F.3d at 885; *A & S Council*, 56 F.3d at 234; *see also Spodek v. United States*, 26 F.Supp.2d 750 (following the Fourth, Sixth, and District of Columbia Circuit's approach after noting the circuit split on the issue and listing cases following each approach); *Fortna, Inc.*, 2000 WL 33119416, at *1 (E.D.Pa. Dec.29, 2000) (reasoning that it would follow "the great weight of authority" and find that the CDA vests exclusive jurisdiction over claims regarding procurement contracts with executive agencies, such as the Postal Service, with either the appropriate agency board of contract appeals or the Claims Court). In light of the more recent and better reasoned opinions of the Fourth, Sixth, and District of Columbia Circuits, the court concludes that the Tenth Circuit would reject the Ninth Circuit's reasoning in *Liberty Construction*.

Having rejected the sole authority on which the Ninth Circuit rested its opinion in *Wright*, the court declines to follow *Wright*. Instead, the court concludes, like

---

**2.** The court acknowledges that its holding likely prevents Tradesmen from suing the Postal Service because the sponsorship approach is impractical here. Additionally, the Miller Act's bond requirement, which was intended to protect subcontractors, is also unavailing. The fact that these options are not available to Tradesmen here, however, is not pertinent to the court's preemption analysis. It remains clear that Congress intended to provide a comprehensive scheme for processing government contract claims and the possibility that a particular claimant could be disadvantaged because of unanticipated circumstances is a matter left to Congress to remedy.

**3.** In fact, in *Wright* the court's analysis is limited to stating that *Liberty Construction* decides the issue. *Wright* does not, for example, attempt to refute the arguments set out in *Eastern* or otherwise negate the persuasive arguments made by other courts deciding the issue the other way. While it is understandable why the Ninth Circuit did not undertake that endeavor given its recent holding in *Liberty Construction*, it nonetheless leaves this court less persuaded by *Wright*.

other district courts to decide the issue, that the CDA preempts the "sue and be sued" clause of the PRA, thereby restoring the sovereign immunity of government agencies to action by subcontractors in district court. Accordingly, the Postal Service's motion to dismiss pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction is granted.

## B. Tradesmen's Claims

Having determined that this court lacks jurisdiction over Tradesmen's claims against the Postal Service, the court turns to Lockheed Martin's motion to dismiss Tradesmen's three claims against it.

### 1. Third–Party Beneficiary Breach of Promise

■■■ Tradesmen contends that Lockheed Martin breached its contractual obligation to purchase a Miller Act bond for its benefit. In support of this position, Tradesmen points to a clause in Lockheed Martin's contract with the Postal Service which states that Lockheed Martin agreed to comply with any applicable federal law "in connection with the performance of the contract." This clause, according to Tradesmen, illustrates an intention by Lockheed Martin and the Postal Service to purchase a Miller Act bond to benefit and protect subcontractors and sub-subcontractors, like Tradesmen. Therefore, Tradesmen contends that it was a intended third-party beneficiary of the contract.

Lockheed Martin argues that Tradesmen's allegations fail to state a claim because it "is obvious from the language of the contract provision that neither Lockheed Martin nor the USPS intended for the provision to benefit plaintiff." It points out that "Tradesmen was not mentioned in the provision, nor was there any reference made to subcontractors or sub-subcontractors." Lockheed Martin also argues that if the provision Tradesmen relies upon is read in context with the rest of the contract, "it becomes apparent that neither party intended for the provision to serve as a promise to procure Miller Act bonds for the USPS project." The "contract specifically required Lockheed Martin to report subcontracting activities with regard to the participation of small, minority and women-owned businesses" but "makes no mention of any requirement to post Miller Act bonds." Finally, citing *Noller*, 772 P.2d at 275, Lockheed Martin contends that the right of a third-party beneficiary rests on the notion that the contract will create reasonable expectations on its part and will induce it to change its position on reliance thereof. Here, according to Lockheed Martin, Tradesmen did not and cannot allege that the contract between Lockheed Martin and the Postal Service created a reasonable expectation on Tradesmen's part that Lockheed Martin would be responsible for Westpac's contractual obligation to Tradesmen.

The court agrees with Lockheed Martin that the unambiguous language of the contract with the Postal Service does not show an intent by Lockheed Martin to purchase a Miller Act bond for the benefit of Tradesmen. Accordingly, the court concludes that Tradesmen was not an intended beneficiary of the contract.

■■■ Under Kansas law[4], an entity that was the intended beneficiary of a contractual obligation may bring a cause of action for damages stemming from the breach of that obligation, even though it was not a party to the contract and had no

---

4. The court will apply Kansas law in this action because both parties applied it in their papers.

knowledge of it when made. *Wolfgang v. Mid–America Motorsports, Inc.,* 111 F.3d 1515, 1524 (10th Cir.1997) (citing *Cornwell v. Jespersen,* 238 Kan. 110, 708 P.2d 515, 520 (1985)). The third party need not be identified in the contract or at the time of contracting to be an intended beneficiary. *Id.* (citing *Noller v. GMC Truck & Coach Div.,* 13 Kan.App.2d 13, 760 P.2d 688, 697 (1988), *aff'd in part, rev'd in part,* 244 Kan. 612, 772 P.2d 271 (1989)).

 To determine whether the contracting parties intended for a third party to be an intended beneficiary, the court must apply the general rules for construction of contracts. *Id.* (citing *Fasse v. Lower Heating & Air Conditioning,* 241 Kan. 387, 736 P.2d 930, 933 (1987); *Cornwell,* 708 P.2d at 521.) If the contract terms are plain and unambiguous, the intention of the parties and the meaning of the contract must be determined from the instrument itself. *Id.* (citing *Fasse,* 736 P.2d at 933; *Martin v. Edwards,* 219 Kan. 466, 548 P.2d 779, 785–86 (1976)). If, however, the contract is ambiguous on its face and therefore requires aid to clarify its intent, then the court will consider evidence of the facts and circumstances surrounding its execution. *Id.* (citing *Martin,* 548 P.2d at 786). "A contract is ambiguous when the words used to express the meaning and intention of the parties are insufficient in the sense the contract may be understood to reach two or more possible meanings." *Id.* (quoting *Fasse,* 736 P.2d at 933).

 Under Kansas law, contracting parties are presumed to act for their own benefit; therefore, an intent to benefit a third party must be clearly expressed in the contract. *Fasse,* 736 P.2d at 932. However, the third party need not be the exclusive beneficiary of the promisor's obligations. *Id.* That is, the contract may benefit the contracting parties as well. *Id.* (citations omitted). Additionally, the third-

party beneficiary need not be personally named in the contract as long as it is "a member of a designated class or identifiable in some manner as a benefitted person." *Hartford Fire Ins. Co. v. W. Fire Ins. Co.,* 226 Kan. 197, 597 P.2d 622, 632 (1979). Thus, until a third party identifies a specific contractual provision operating to its benefit, the court may not reach the issue of whether a third party may directly enforce a contract from which it would benefit. *Id.; United States v. United Servs. Auto. Ass'n,* 968 F.2d 1000, 1002 (10th Cir.1992).

In *Fasse,* the Kansas Supreme Court addressed the issue of whether employees of a subcontractor were entitled to bring an action against a contractor as third party beneficiaries of a contract between the contractor and owner which incorporated wage rates required for a federal construction project. 736 P.2d at 933. The court held that the employees could bring a third-party beneficiary cause of action against the contractor because the express language of the contract, which stated that the contractor would pay wages as set by the Davis–Bacon Act, was intended to benefit the employees. *Id.* at 931. The contract language in question stated:

The 'current rate of per diem wages,' for purposes of this project, shall be defined as and synonymous with the required wages and benefits for each job classification in federal and federally assisted construction projects in Shawnee County, Kansas as determined by the Secretary of Labor of the United States Government, pursuant to the Davis–Bacon act, (40 U.S.C. 276a *et seq.*), current and effective upon the date of execution of the contract.

*Id.*

Comparing the contract language in question here to that in *Fasse* illustrates the deficiency in Tradesmen's claim.

Tradesmen rests its claim on paragraph H.13 of Lockheed Martin's contract with the Postal Service, entitled Permits and Responsibilities, which provides:

> The supplier [Lockheed Martin] is responsible, without any additional expense to the Postal Service, for obtaining any necessary licenses and permits, and for complying with any applicable federal, state, and municipal laws, codes, and regulations in connection with the performance of the contract. The supplier is responsible for all damages to persons or property, including environmental damage, that occurs as a result of its omission(s) or negligence. The supplier must take proper safety and health precautions to protect the work, the workers, the public, the environment, and the property of others.[5]

Tradesmen argues that by agreeing to comply with applicable federal laws, Lockheed Martin agreed to purchase a Miller Act bond to benefit and protect Tradesmen. The court, however, finds this language distinguishable from the contract language in *Fasse*. In *Fasse*, the laborers asserting a claim pointed to a provision of the contract that clearly was intended to benefit them. Here, by contrast, the language fails to show an intent to benefit Tradesmen. To be analogous to *Fasse*, the contract language would have had to state that Lockheed Martin agreed to comply with the requirements of the Miller Act.

Any assertion by Tradesmen that the language in the contract could be interpreted to suggest that Lockheed Martin agreed to comply with the requirements of the Miller Act and post a payment bond is negated by comparing the requirements of the Miller Act to the express language of the contract. The Miller Act states:

> Before any contract for the construction, alteration, or repair of any public building or public work of the United States is awarded to any person, such person shall furnish to the United States the following bonds, which shall become binding upon the award of the contract to such person, who is hereinafter designated as "contractor":
>
> \* \* \* \* \* \*
>
> (2) A payment bond with a surety or sureties satisfactory to such officer for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract for the use of each such person.

40 U.S.C. § 270a. The language of the contract between the Postal Service and Lockheed Martin states that Lockheed Martin is responsible for complying with any applicable federal laws "in connection with the performance of the contract." The inclusion of the phrase "in connection with the performance of the contract" negates the possibility that this language expressed an intent to post a Miller Act payment bond. To comply with the Miller Act, the applicable federal law, Lockheed Martin would have had to post the payment bond before the contract was awarded, not "in connection with the performance of the contract." Thus, it is clear from the unambiguous language of the contract between Lockheed Martin and the Postal Service that the parties did not

---

**5.** Although Tradesmen did not attach a copy of the Lockheed Martin/Postal Service contract to its complaint, the court will nonetheless consider it because Lockheed Martin attached a copy of the contract to its motion to dismiss. *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) (explaining that "[i]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss").

intend to benefit Tradesmen. Accordingly, Tradesmen was not an intended third-party beneficiary, and Lockheed Martin's motion to dismiss this claim is granted.

## 2. Unjust Enrichment

■ Next, Tradesmen claims that it is entitled to recover from Lockheed Martin on a theory of unjust enrichment. Specifically, Tradesmen alleges that it conferred a benefit on Lockheed Martin by providing skilled labor on the projects, Lockheed Martin accepted the benefits with the knowledge that Tradesmen expected and was entitled to compensation for the benefits provided, and Lockheed Martin was aware that WestPac was insolvent or otherwise incapable of completing the subcontract and paying Tradesmen.

Lockheed Martin argues that Tradesmen has failed to state a claim for unjust enrichment because it has failed to allege that Lockheed Martin was notified that Tradesmen expected to be compensated by Lockheed Martin. Tradesmen refutes this argument by pointing to the allegations in paragraph 26 of its first amended complaint:

During and after Tradesmen's performance on the Sub-subcontract, representatives of both Lockheed Martin and USPS were aware that Tradesmen was providing valuable and useful construction services on the Projects. Lockheed's personnel expressed great satisfaction with Tradesmen's work on the Projects. Upon information and belief, defendants knew of WestPac's inadequate performance of the Subcontract and WestPac's serious financial difficulties, yet Lockheed Martin's representatives knowingly accepted Tradesmen's services and even offered to hire Tradesmen's employees directly.

According to Tradesmen, these allegations show that Lockheed Martin was aware of the valuable benefits Tradesmen conferred upon it, and that Lockheed Martin accepted or retained the benefits of Tradesmen's work under circumstances making it inequitable for Lockheed Martin to retain the benefits without paying for them. Such allegations, according to Tradesmen, are sufficient to state a claim. The court cannot agree.

■ Unjust enrichment and restitution "are modern designations for the older doctrine of quasi-contracts." *Haz–Mat Response, Inc. v. Certified Waste Servs. Ltd.,* 259 Kan. 166, 910 P.2d 839, 846 (1996) (citations omitted). Such a right "is raised by the law on the basis of justice and equity regardless of the assent of the parties." *Id.* (citations omitted). "The substance of an action for unjust enrichment lies in a promise implied in law that one will restore to the person entitled thereto that which in equity and good conscience belongs to him." *Id.* (citations omitted).

■ A plaintiff asserting an unjust enrichment claim must show: "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value." *Id.* at 847 (quoting *J.W. Thompson Co. v. Welles Prods. Corp.,* 243 Kan. 503, 758 P.2d 738, 745 (1988)).

In *Haz–Mat,* the Kansas Supreme Court, after reviewing previous cases on the issue, concluded "that the circumstances under which an unjust enrichment claim may be brought by a subcontractor against an owner, absent privity, are indeed limited." *Id.* The court added that for such an action to lie, "there must exist some special circumstances that would justify requiring the owner to pay." *Id.* Elaborating on when such circumstances

exist, the court stated "that an essential prerequisite to such liability is the acceptance by the owner (the one sought to be charged) of benefits rendered under such circumstances as reasonably notify the owner that the one performing the services expected to be compensated therefore by the owner." *Id.* The court added: "In the absence of evidence that the owner misled the subcontractor to his or her [or its] detriment, or that the owner in some way induced a change of position in the subcontractor to his or her [or its] detriment, or some evidence of fraud by the owner against the subcontractor, an action for unjust enrichment does not lie against the owner by a subcontractor." *Id.*

In *Haz–Mat* and *J.W. Thompson,* a subcontractor brought a claim against the owner. Here, in contrast, a sub-subcontractor, Tradesmen, brought a claim against the contractor, Lockheed Martin. The analysis, however, is identical. *See, e.g., U.S. East Telecomms., Inc. v. U S West Communications Servs., Inc.,* 38 F.3d 1289, 1296–97 (2d Cir.1994) (applying similar rules to a dispute between contractors and second-tier subcontractor).

Here, Tradesmen alleges that Lockheed Martin "accepted the benefits conferred by Tradesmen with the knowledge both that Tradesmen expected and was entitled to compensation for the benefits provided and that WestPac was insolvent and/or incapable of completing the subcontract or paying Tradesmen." Moreover, Tradesman points out that Lockheed Martin was aware that no Miller Act bond was secured to protect sub-subcontractors such as Tradesmen. In Tradesmen's words, "Defendants knew they were going to fire WestPac and accept Tradesmen's services with knowledge that WestPac would 'stiff' Tradesmen."

The court concludes these allegations do not qualify as the type of "special circumstances" the Kansas Supreme Court describes in Haz–Mat. Haz–Mat instructs that "an essential prerequisite" of an unjust enrichment action is acceptance by the one sought to be charged of benefits rendered under such circumstances as to reasonably notify that entity that the one performing such services expects to be compensated therefor by it. 910 P.2d at 847. Tradesmen has not alleged that it informed Lockheed Martin that it expected to be paid by it or that the circumstances under which Lockheed Martin accepted the fruits of Tradesmen's labor should have reasonably notified Lockheed Martin that Tradesmen expected to be paid by Lockheed Martin. Instead, Tradesmen alleges merely that Lockheed Martin continued to accept the benefits of Tradesmen's labor at a time when it knew both that Tradesmen expected to be paid and WestPac was insolvent. Moreover, Tradesmen does not allege, as *Haz–Mat* requires, that Lockheed Martin misled Tradesmen to its detriment, that Lockheed Martin in some way induced a change of position in Tradesmen to its detriment, or that there is evidence of fraud by Lockheed Martin against Tradesmen. In short, Tradesmen's allegations are not equivalent to the limited circumstances discussed in *Haz–Mat* in which an unjust enrichment claim may be brought under Kansas law.

Finally, Tradesmen's allegations neglect another requirement of an unjust enrichment claim. Tradesmen does not allege that Lockheed Martin did not pay WestPac.[6] Put another way, Tradesmen

---

6. As the court explains below, another potential alternative is for Tradesmen to argue that Lockheed Martin's payments to WestPac were wrongful given WestPac's financial instability and Tradesmen's interest in such money. Although the court has not located any cases applying this concept to an unjust enrichment claim, the court believes that the concept

does not allege that Lockheed Martin failed to pay for the benefits conferred upon it. Thus, any benefit Lockheed Martin may have received from Tradesmen was not unjust. *Holiday Dev. Co. v. J.A. Tobin Constr. Co.*, 219 Kan. 701, 549 P.2d 1376, 1383 (1976) (explaining, in an analogous unjust enrichment case, that "the prime contractor may already have been paid in full by the owner for the improvements furnished by the subcontractor or materialman and there really is no unjust enrichment"); *see also Paschall's, Inc. v. J.P. Dozier*, 219 Tenn. 45, 407 S.W.2d 150, 155 (1966) ("The most significant requirement for recovery on quasi contract is that the enrichment to the defendant be unjust [;][c]onsequently, if the landowner has given any consideration to any person for the improvements, it would not be unjust for him to retain the benefit without paying the furnisher.").[7] Accordingly, the court grants Lockheed Martin's motion to dismiss Tradesmen's unjust enrichment claim with leave to amend by November 29, 2002, in an attempt to cure the deficiencies set forth above.

### 3. Equitable Lien

 Lastly, Tradesmen seeks an equitable lien on funds retained by Lockheed Martin. Specifically, Tradesmen alleges that Lockheed Martin failed to secure a payment bond and failed and refused to compensate Tradesmen, despite Tradesmen's repeated demands for compensation and Lockheed Martin's knowledge of the benefits conferred upon it. Therefore, Tradesmen contends that it "is entitled to an equitable lien, in an amount not less than $86,624.32, against the Retained Funds, as well as any funds managed, held, or controlled, by ... Lockheed Martin in connection with the Projects."

In support of its position, Tradesmen relies on *Kennedy Elec. Co. v. United States Postal Serv.*, 508 F.2d 954 (10th Cir.1974). In *Kennedy*, a subcontractor who performed work on a post office building, but who was not paid because the contractor was insolvent and no Miller Act bond was posted, brought a "two pronged" equitable lien cause of action against the Postal Service for labor and material furnished. *Id.* at 955. The first prong of his equitable lien related to $35,739.47 which the Postal Service retained, and the second prong related to $190,747.00 which the Postal Service paid to the contractor's assignee in violation of various regulations. *Id.* After considering the equities of the parties' circumstances, the Tenth Circuit held that the subcontractor was entitled to an equitable lien both on the funds retained by the Postal Service and the money wrongfully disbursed to the contractor's assignee. *Id.* at 960.

*Kennedy*, however, is distinguishable from the facts plead in Tradesmen's first amended complaint. First, Tradesmen has not alleged that Lockheed Martin retained any of the funds earmarked for WestPac. By contrast, in *Kennedy* the Postal Service retained $35,739.47 of the money it was required to pay its contractor's assignee under its contract. Additionally, Tradesmen has not made any allegation of wrongful payments by Lockheed Martin to WestPac. By contrast, in *Kennedy* the court concluded that the Postal Service transferred $190,747.00 to the con-

---

could potentially apply in an analysis of the equities of the situation.

7. The court, at this stage, does not reach Lockheed Martin's argument that "it paid WestPac a substantial amount of money un-

der its contract with WestPac." The court is constrained to addressing the allegations set forth in plaintiff's complaint when ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim.

tractor's assignee in a wrongful manner. The court noted that the Postal Service "had notice of the Kennedy [plaintiff's] claim and knew that there was slight chance that the money would be used to complete the contract or to pay the subcontractor." *Id.* at 958. In short, the court concludes that Tradesmen has failed to allege that there is any "retainage" to which a lien could attach. The court, therefore, does not reach the issue of whether Tradesmen is entitled to an equitable lien on the retainage. Accordingly, the court grants Lockheed Martin's motion to dismiss Tradesmen's equitable lien claim with leave to amend by November 29, 2002, in an attempt to cure the deficiencies set forth above.

The court understands the difficult circumstance in which Tradesmen currently rests. In Part A of the court's opinion, the court concluded that the Postal Service cannot be sued due to sovereign immunity. In Part B of the court's opinion, the court concluded that Tradesmen was not an intended beneficiary of the Lockheed Martin/Postal Service contract, and that at this point in the litigation Tradesmen has failed to state an unjust enrichment or equitable lien claim. The court is also sympathetic to Tradesmen's equitable position that the purpose of a Miller Act bond is to protect subcontractors (as well as sub-subcontractors), that as a sub-subcontractor it was reasonable to expect that such a bond would be purchased on this project, that for whatever reason such a bond was not purchased here, and, therefore, from an equitable standpoint either the Postal Service or Lockheed Martin should be responsible, given WestPac's insolvent posture. The law, however, appears clear that unless Tradesmen can show either that Lockheed Martin retained a portion of the money owing to WestPac under their contract or that Lockheed Martin's payments to WestPac were in some way wrongful, such

that Lockheed Martin has unfairly benefitted, then the court must conclude that Tradesmen has failed to state a claim for relief. The Tenth Circuit, in concluding that a claim could not be brought against the Postal Service under the Federal Tort Claims Act for failure to require a Miller Act bond, stated that a claim cannot be brought against a contractor solely for failure to post a Miller Act bond. *McMann v. N. Pueblos Enter., Inc.*, 594 F.2d 784, 785–86 (10th Cir.1979) ("As the Miller Act deals exclusively with federal contracts, private persons would never be in a position to require the posting of a Miller Act bond by a contractor [;][i]t follows that private persons could not possibly be liable for any negligent failure to insist on the posting of such a bond."). Under all of these circumstances, Tradesmen unfortunately may have no remedy for the harm it suffered as a result of WestPac's failure to pay it in light of the failure of the Postal Service to require the posting of a Miller Act bond.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the Postal Service's motion to dismiss for lack of subject matter jurisdiction (Doc. 22) is granted, and Lockheed Martin's motion to dismiss for failure to state a claim (Doc. 27) is granted as to the third-party beneficiary breach of contract claim (Count II) and granted with leave to amend the unjust enrichment and equitable lien claims (Counts I and III) in an attempt to cure certain deficiencies in the claims, to the extent set forth above, on or before November 29, 2002.